James C. Tecce
Julia M. Beskin
Kate Scherling
Jordan Harap
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22ⁿᵈ Floor
New York, NY 10010

*Counsel for William A. Brandt, Jr., as*
*Trustee of CFG Peru Investments Pte. Ltd. (Singapore)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ----------------------------------------------------------- x | | |
| In re: | : | Case No. 16-11895 (JLG) |
| | : | |
| CHINA FISHERY GROUP LIMITED | : | Chapter 11 (Jointly Administered) |
| (CAYMAN), et al., | : | |
| | : | |
| Debtors. | : | |
| ----------------------------------------------------------- x | | |
| In re: | : | Case No. 16-11914 (JLG) |
| | : | |
| CFG PERU INVESTMENTS PTE. LTD. | : | Chapter 11 |
| (SINGAPORE), | : | |
| | : | |
| Debtor. | : | |
| ----------------------------------------------------------- x | | |
| WILLIAM A. BRANDT, JR., AS TRUSTEE OF | : | Adv. Pro. No. 18-01575 (JLG) |
| CFG PERU INVESTMENTS PTE. LTD. | : | |
| (SINGAPORE), | : | |
| Plaintiff, | : | **FIRST AMENDED COMPLAINT** |
| | : | |
| v. | : | |
| | : | |
| THE HONGKONG AND SHANGHAI | : | |
| BANKING CORPORATION LIMITED, | : | |
| | : | |
| Defendant. | : | |
| ----------------------------------------------------------- x | | |

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................1

II.   JURISDICTION & PARTIES .................................................................................5

III.  FACTUAL ALLEGATIONS ....................................................................................6

      A.    CF GROUP .................................................................................................6

      B.    PERUVIAN BUSINESS AND FINANCING OF FISHMEAL OPERATIONS ..........8

      C.    APRIL 2014 THROUGH NOVEMBER 2015: CLUB LENDERS PROVIDE
            EXTENSIONS AND INITIATE MEASURED SALE PROCESS............................11

            1.    EXTENSIONS AND WAIVERS RELATING TO CLUB FACILITY .....................11

            2.    HSBC DEMANDS REPAYMENT OF BILATERAL FACILITIES ........................12

            3.    NOVEMBER 10, 2015: EIGHTH AMENDMENT................................................14

      D.    NOVEMBER 25, 2015: HSBC INITIATES EX PARTE LIQUIDATION
            PROCEEDINGS ........................................................................................15

      E.    CLUB LENDERS DID NOT SUPPORT LIQUIDATION PROCEEDINGS............23

      F.    LIQUIDATION PROCEEDINGS HARM PERUVIAN OPERATIONS .................26

      G.    HONG KONG COURT DISMISSES HSBC'S JPLS; HSBC SECURES
            UNDERTAKING .......................................................................................28

      H.    STIGMA OF LIQUIDATION PROCEEDING LINGERS AFTER JPLS ARE
            DISMISSED .............................................................................................31

      I.    HSBC INTERFERES WITH SALE PROCESS .............................................32

      J.    CHAPTER 11 CASES COMMENCED IN NEW YORK ..................................37

      K.    HSBC WAS AN INSIDER OF PACIFIC ANDES COMPANIES ......................40

FIRST COUNT........................................................................................................42

SECOND COUNT....................................................................................................44

THIRD COUNT........................................................................................................46

FOURTH COUNT....................................................................................................50

FIFTH COUNT.........................................................................................................52

SIXTH COUNT.........................................................................................................53

SEVENTH COUNT..................................................................................................55

PRAYER FOR RELIEF ...........................................................................................59

Plaintiff William A. Brandt, Jr., as chapter 11 trustee (the "Trustee") for CFG Peru

Investments Pte. Ltd. (Singapore) ("CFG Peru"), a Debtor[1] in these Chapter 11 Cases, through

his undersigned counsel, brings this action and alleges as follows:[2]

## I.     PRELIMINARY STATEMENT[3]

1.      The Trustee brings this action seeking redress for the damage caused by a creditor

whose conduct exceeded the boundaries of commercial reasonableness, damaged CFG Peru's

equity interest in the Peruvian OpCos—the sale of which is the cornerstone of the U.S.

restructuring effort—and diminished recovery prospects for the CF Group's (and Pacific Andes

Group's) creditors, including CFG Peru.  While courts traditionally afford lenders latitude when

pursuing the repayment of their debts, there are limitations.  This case will be cited for enforcing

those limits in the face of unbridled overreach.

2.      In November 2015, the Club Lenders had agreed to the eighth amendment to their

$650 million loan and were working cooperatively with the Debtors to pursue a measured sale of

the Peruvian Business.  On November 25, 2015, after forcing the Pacific Andes Group to repay

---

[1]     The debtors in these chapter 11 cases are:  China Fishery Group Limited (Cayman) ("CFGL"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), N.S. Hong Investment (BVI) Limited ("N.S. Hong"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), China Fisheries International Limited (Samoa) ("CFIL"), CFGL (Singapore) Private Limited ("CFGLPL"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Growing Management Limited (BVI) ("Growing Management"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), Ocean Expert International Limited (BVI) ("Ocean Expert"), Protein Trading Limited (Samoa) ("Protein Trading"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru"), Smart Group Limited (Cayman) ("Smart Group"), Super Investment Limited (Cayman) ("Super Investment"), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd., Golden Target Pacific Limited, Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited, and Toyama Holdings Limited (BVI) (collectively, the "Debtors").

[2]     A redline of the First Amended Complaint against the Complaint is attached hereto as **Exhibit A**.

[3]     Capitalized terms not defined in the Preliminary Statement are defined herein.

1

more than $100 million in outstanding bilateral credit facilities, HSBC abruptly broke ranks with
the other Club Lenders under the multilateral Club Facility and petitioned a Hong Kong court on
an ex parte basis to appoint provisional liquidators with respect to CFGL and CFIL.  Shortly
thereafter, HSBC also petitioned for the appointment of joint provisional liquidators in the
Cayman Islands.

3.      The timing of HSBC's pursuit of such an extraordinary remedy could not have
been worse.  The Peruvian Business was rebounding from the effects of El Niño, the second
fishing season for 2015 was about to commence, and the Peruvian Business was at the typical
low-point of its cash position for the year and could not operate without the assistance of
Peruvian banks.  After the Hong Kong JPLs were appointed at HSBC's request and dispatched to
Peru to wrestle control of the Peruvian Business, local banks refused to provide financing,
restricting operations and impeding the Peruvian Business' ability to realize the quota allotted to
it by the Peruvian government.

4.      The JPLs' appointment also damaged the prospects for a value-maximizing sale
for the Peruvian Business.  In November 2015, fifteen industrial or financial parties had
expressed interest, and two investors interested in acquiring the CF Group for as much as $1.7
billion were in discussions with the Pacific Andes Group.  A memorandum of understanding was
expected to be signed on November 26, 2015.  HSBC commenced the proceedings the day
before, on November 25, 2015, and scuttled those negotiations.  HSBC capriciously commenced
the liquidation proceedings even though, at that time, HSBC understood the status of the sale
process, including the number of potential bidders, the range of potential bids, and the upcoming
deadlines.  HSBC understood that its actions would depress values that could be obtained in the
sale.

2

5.      The recklessness of HSBC's conduct was confirmed six weeks later on January 5, 2016, when the Hong Kong Court reversed its order appointing the Hong Kong JPLs and terminated their appointment.  Among other things, HSBC's ex parte application relied on a selective presentment of facts, specifically a report prepared by FTI Consulting Hong Kong ("FTI") a year earlier.  After a trial where additional facts were supplied to the court by other parties, including the Club Lenders, it became clear that the JPLs' appointment was neither warranted nor necessary (let alone urgent), and the Hong Kong Court dismissed the liquidators.[4]

6.      However, the damage HSBC caused could not be remedied.  In Peru, management worked tirelessly to restore creditor and vendor confidence after the dismissal, but the specter of the JPLs' appointment lingered.  Relationships with critical working capital providers, trade vendors, inventory financing sources, and customers were incurably infected by sustained concern about the implications of a liquidation proceeding.

7.      HSBC understood the leverage that threatening liquidation proceedings gave it over the CF Group and wielded that threat to exercise control.  While HSBC agreed to suspend the liquidation proceedings, it only did so after extracting a tendentious Deed of Undertaking in January 2016.  HSBC dropped its appeal from the Hong Kong Court decision dismissing the JPLs and withdrew the Cayman JPLs' appointment on the condition that the company accede to a truncated sale deadline of July 15, 2016 and the appointment of Paul Brough as Chief Restructuring Officer.  Critically, HSBC reserved the right to reappoint the Cayman JPLs if the company did not comply with the sale deadline.

---

[4]      See Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern District Of New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶¶ 114-18; see also August 23, 2016 Ng Declaration (Dkt. 105) at ¶¶ 64, 79; In re China Fisheries Int'l Ltd., HCMP 134/2018 [2019] H.K.C.F.I. 174 at 10:F-H.

8.      The HSBC Undertaking quickly proved to be value-depletive.  The short fuse HSBC attached to the sale process, coupled with the change in market sentiment brought about by the commencement of liquidation proceedings and the liquidators' appointment, interfered with the ongoing sale process.  Had the indications of interest totaling approximately $1.7 billion immediately prior to the Hong Kong JPLs' appointment on November 25, 2015 ripened into binding agreements, the resulting sale would have provided for substantial recoveries to the creditors of the CF Group and the Pacific Andes Group.  Instead, the accelerated sale process instituted and enforced by HSBC resulted in substantially lower bids that ascribed significantly less value to the Peruvian Business than would have been realized absent HSBC's interference. HSBC bears responsibility for the harm and value depletion its interference caused.

9.      Regardless of which law applies—Peruvian law, Hong Kong law, or U.S. law— HSBC's conduct gives rise to common law claims for negligence, breach of duty, and tortious interference.  HSBC is liable for damages caused to CFG Peru in both CFG Peru's capacity as the owner of the equity in the Peruvian OpCos and as a creditor of CFGL, CFIL, and Smart Group, including (a) damages resulting from the Peruvian Business' lost revenue and profit, increased financing costs, lost capacity, and inability to realize the quota allocated to it by the Peruvian government—in an amount to be proven at trial, but not less than $45 million; and (b) damages to the value of the Peruvian Business caused by HSBC's interference with both its operations and a measured and deliberate process for a sale (as reflected by, among other things, the differences between bids received before and after the appointment of the JPLs)—in an amount to be proven at trial, but not less than $200 million.  Finally, HSBC's claims against the estates totaling more than $100 million should be equitably subordinated or disallowed given the extent to which HSBC exceeded the confines of permissible conduct and the damage it caused.

4

Equity dictates that HSBC forfeited any entitlement to a recovery from the estates.

## II.    JURISDICTION & PARTIES

10.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

11.    On June 30, 2016 (the "Petition Date"), the Debtors, including CFG Peru, filed voluntary petitions with the United States Bankruptcy Court for the Southern District of New York (the "Court") for relief under chapter 11 of the Bankruptcy Code.  On July 14, 2016, the Court entered an order consolidating the chapter 11 cases (together, the "Chapter 11 Cases") (Dkt. 27).  The Chapter 11 Cases remain pending.

12.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).

13.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C), and (O).

14.    The Trustee consents to the entry of a final Order by this Court with respect to all counts in this Complaint.

15.    Plaintiff is William A. Brandt, Jr., in his capacity as Trustee for CFG Peru.  The Trustee's appointment was confirmed by an Order dated November 10, 2016 (Dkt. 219).

16.    CFG Peru is the direct or indirect owner of 100% of the equity of the Peruvian OpCos and SFR (as those terms are defined herein).

17.    Defendant is The Hongkong and Shanghai Banking Corporation Limited ("HSBC"), a banking entity incorporated and headquartered in the Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong").

18.    This Court can exercise personal jurisdiction over HSBC because, among other things, HSBC (a) has filed proofs of claim in the chapter 11 cases of CFGL (Case No. 16-

11895), CFIL (Case No. 16-11896), N.S. Hong (Case No. 16-11899), and Smart Group (Case

No. 16-11910) seeking in excess of $100 million (the "Proofs of Claim"); (b) entered notices of

appearance in each of those cases and the chapter 11 case of CFG Peru (No. 16-11914); (c)

requested affirmative relief from this Court, including sustaining its objection to the retention of

the Trustee's conflicts counsel, Quinn Emanuel Urquhart & Sullivan LLP.  In its decision

granting the Trustee's motion for approval to propound discovery pursuant to Rule 2004 of the

Federal Rules of Bankruptcy Procedure, this Court concluded that HSBC had submitted to its

jurisdiction by filing the Proofs of Claim.[5]  In denying HSBC's motion for leave to appeal the

Rule 2004 Decision, the United States District Court for the Southern District of New York

confirmed that proposition.[6]  The United States Court of Appeals for the Second Circuit rejected

both HSBC's appeal from the District Court's decision and HSBC's subsequent petition for

rehearing en banc.[7]

### III.   FACTUAL ALLEGATIONS

#### A.   CF GROUP

19.    The Pacific Andes group of companies is the twelfth largest seafood company in

the world.  N.S. Hong is the ultimate and indirect owner of all the Debtors, including Pacific

Andes International Holdings Limited ("PAIH") (together, N.S. Hong and PAIH with their direct

and indirect subsidiaries, are hereinafter referred to as the "Pacific Andes Group").

---

[5]    See In re China Fishery Grp. Ltd., No. 16-11895 (JLG), 2017 WL 3084397 (Bankr. S.D.N.Y. July 19,
2017) (Memorandum Decision and Order Granting Trustee's Motion To Authorize Issuance of Subpoenas
to Hongkong Shanghai Banking Corporation Limited (the "Rule 2004 Decision")).

[6]    See Hongkong & Shanghai Banking Corp. Ltd. v. Brandt for CFG Peru Investments Pte. Ltd. (Singapore),
2017 WL 6729191, at *5-6 (S.D.N.Y. Dec. 29, 2017) (denying leave to appeal Rule 2004 Decision and
noting, among other things, that "it is clear that filing a proof of claim generates personal jurisdiction over a
creditor, a position as to which there is no substantial ground for a difference of opinion").

[7]    HSBC v. Brandt (In re China Fishery Ltd. (Cayman), No. 18-5 (2d Cir.) Dkt. No. 41 (Order dated May 21,
2018 dismissing appeal); Dkt. No. 45 (Order dated July 3, 2018 denying motion for reconsideration en
banc).

20.     In 2004, indirect subsidiaries of PAIH bought an interest in the China Fishery Group (the "CF Group"), which is a group of companies owned by China Fishery Group Limited ("CFGL"), a public company incorporated under the laws of the Cayman Islands.

21.     In 2013, the CF Group acquired Corporacion Pesquera Inca S.A.C. ("Copeinca") for an acquisition cost of approximately $1.04 billion.  In 2013, Copeinca held a 10.7% quota for Peru's anchovy harvest.  CF Group operates as part of the Pacific Andes Group:



Figure 1.  The Pacific Andes Group.

22.     Thirteen of the sixteen Debtors[8] in these Chapter 11 Cases are members of the CF Group.  CFG Investments S.A.C. ("CFGI"), Copeinca, and Sustainable Fishing Resources S.A.C.

---

[8]      The thirteen Debtors are:  CFGL; Smart Group; Protein Trading; SPSA; CFG Peru; CFIL; Growing Management; Chanery; Champion; Target Shipping; Fortress; CFGLPL; and Ocean Expert.

("SFR"), which are not Debtors in these Chapter 11 Cases, are also part of the CF Group.

23.    The main operating entities of the CF Group are CFGI and Copeinca and
(together, the "Peruvian OpCos"), which produce and sell fishmeal.  SFR is the Peruvian OpCos'
sister company in the open water fleet business.  SFR's main assets are the *Damanzaihao*,
considered to be the world's largest fish factory vessel, and five smaller "catcher" vessels.

24.    CFG Peru owns 100% of the equity of CFGI, which indirectly owns 100% of the
equity of Copeinca.  Figure 2 shows the ownership structure of certain relevant entities in the CF
Group.



Figure 2.  Ownership Structure of Certain Entities in the CF Group.

### B.    PERUVIAN BUSINESS AND FINANCING OF FISHMEAL OPERATIONS

25.    The CF Group, primarily through CFGI and Copeinca, sources, harvests, on-
board-processes, and delivers high-quality fish products to consumers around the world and
engages in fishing, fishmeal and fish oil processing and production in Peru for worldwide

distribution (the "Peruvian Business").

26.    Anchovy fishing is heavily regulated by the Peruvian government.  The Peruvian system divides anchovy stock into two zones:  (i) the northern and central region and (ii) the southern region.

27.    The Peruvian OpCos harvest Peruvian anchovy in both regions.  Each region has its own two seasons which are determined by the Ministry of Production.  The northern and central region's two yearly fishing seasons generally run from April to July and November to December and produce the majority of anchovy.  The southern region's two fishing seasons are contiguous, usually from January to July and from August to December, meaning that the southern region can be fished year round.

28.    The Peruvian OpCos' anchovy fishery operations are carried out under Peru's Individual Transferable Quota system, which was introduced in Peru in April 2009.  Under this system, the Peruvian government establishes a Total Allowable Catch ("TAC") for each fishing season in the northern-central and southern zones.  Each individual fishing vessel is then allocated a fixed percentage of the TAC, establishing the vessel's seasonal quota.

29.    Through the Peruvian OpCos, the CF Group owns the largest single block of national quota for the harvest of anchovy in Peru:  16.90% of the TAC for the northern and central zones, the zones most often referred to in connection with the anchovy industry, and another 14.77% of the anchovy harvest capability in the southern Peruvian zone.

30.    The success and viability of the Peruvian Business is dependent upon its being able to harvest anchovies up to the quotas fixed by the Peruvian government.[9]

31.    Substantially all the anchovy harvested by the CF Group is used as raw material

---

[9]    Memorandum Decision And Order Granting Motion For Appointment Of A Chapter 11 Trustee (Dkt. 203) the "Trustee Dec.") at 9.

in its fishmeal operations.  The Peruvian OpCos produce approximately 280,000 to 300,000 metric tons of fishmeal and a further 40,000 to 50,000 metric tons of fish oil.  In the past, these levels of production have generated an annual revenue stream of between $535 million and $585 million, which customarily results in an annual EBITDA figure of between $180 million and $200 million.

32.    The Peruvian OpCos currently have ten processing plants strategically located along the Peruvian coastline near where the anchovy are harvested.  The Peruvian OpCos' vessels make daily fishing trips during the fishing seasons.

33.    The most valuable assets of CFG Peru (through which the CF Group owns the Peruvian OpCos) are (i) the anchovy fishing quotas that have been allotted to CFG Peru's vessels by the Peruvian government; (ii) operative vessels; and (iii) the fishmeal processing plants, including the related plant permits and equipment.

34.    Because of the seasonal nature of their business, the Peruvian OpCos fund operations through local working capital and inventory financing.  Historically, the Peruvian OpCos' largest lender has been Banco de Credito del Peru ("BCP"), which had provided inventory financing of up to $100 million plus an additional $15 million in short-term working capital.  The Peruvian OpCos also received local financing from BBVA Continental ("BBVA") and Scotia Bank.

35.    The inventory financing is used to fund operations during harvesting seasons, including for payments to suppliers and employees, and is repaid when the Peruvian OpCos sell their fishmeal and fish oil following the seasons.  Short term working capital financing is also used.

C.    **APRIL 2014 THROUGH NOVEMBER 2015:  CLUB LENDERS PROVIDE EXTENSIONS AND INITIATE MEASURED SALE PROCESS**

1.    **Extensions And Waivers Relating To Club Facility**

36.    On March 20, 2014, Debtor CFIL and non-Debtors CFGI and Copeinca (collectively, the "Club Borrowers") entered into a $650 million Facility Agreement (as amended from time to time, the "Club Facility") with HSBC, Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard Chartered"), DBS Bank (Hong Kong) ("DBS"), and China CITIC International Limited ("China CITIC" and together with HSBC, Rabobank, Standard Chartered, and DBS, the "Club Lenders").  Rabobank was the agent under the Club Facility for the Finance Parties (as defined therein) (hereinafter, the "Agent").

37.    Funds were made available under the Club Facility, inter alia, to assist with a corporate restructuring of the CF Group's business, pay off existing debt associated with certain acquisitions, and provide revolving credit to pay down other credit facilities.

38.    Between April 30, 2014 and November 11, 2015, the Club Lenders and Club Borrowers entered into eight extension and waiver agreements relating to the obligations under the Club Facility Agreement (the "Extension and Waiver Agreements").

39.    In September 2015, the Debtors engaged Deloitte & Touche Financial Advisory Services Limited ("Deloitte") to address the Club Lenders' concerns about transparency with regard to the Debtors' finances and operations and to perform a limited financial analysis of CFGL, PARD, and PAIH.[10]  On September 25, 2015, Deloitte updated the Club Lenders on, among other things, the financial position of CFGL, PARD and PAIH, cash flow forecasts, a tentative timetable for a restructuring, proposed sales, a site visit to Peru, and a valuation of the

---

[10]    Trustee Dec. at 15.

fishing quota factories and vessels (at a sum of $1.69 billion).[11]

40.     Pursuant to the Sixth Extension and Waiver Request, dated September 30, 2015 (the "Sixth Amendment"), the Club Lenders required the Club Borrowers to, among other things, appoint KPMG as independent financial advisors on behalf of the Club Lenders to review and report on the work undertaken by Deloitte.[12]  HSBC requested that KPMG be selected.

### 2.     HSBC Demands Repayment of Bilateral Facilities

41.     In 2014, HSBC instructed FTI to begin examining certain activities of the Debtors without notifying management of the company of the examination.[13]  What followed was a report given by FTI to HSBC on October 20, 2014 (the "FTI Report").  The FTI Report focused on transactions principally involving Solar Fish and Parkland Group, which are companies within the Pacific Andes Group but are not part of the CF Group.[14]  After FTI prepared its report, HSBC did not present it to the Hong Kong Court for more than a year.  Instead, for the rest of 2014, HSBC focused on getting the balance of its bilateral facilities with the Pacific Andes Group repaid.  Those facilities were structurally subordinated to the Club Facility with respect to the proceeds from the sale of the Peruvian OpCos.

42.     In November 2014, HSBC, notwithstanding internal concerns, developed a strategy to have KPMG installed as provisional liquidators.  See HSBCHK-TR-00008319 (Nov. 11, 2014 email:  "How about preparing for provisional liquidators in case things move fast and the clearance of KPMG for use as provisional liquidators?"); HSBC-TR-00009046 (Nov. 11,

---

[11]     Trustee Dec. at 15-16.

[12]     Trustee Dec. at 16.

[13]     Trustee Dec. at 22 & n. 21.

[14]     See HSBCHK-TR-00045328 (June 30, 2014 email exchange involving Mel Blackford discussing "U-turn transactions involving Solar Fish & Parkmond Group"); HSBCHK-TR-00043862 (August 5, 2014 email exchange containing "provisional findings from Mel" concerning myriad purchases from Solar Fish); HSBCHK-TR-00045698 (August 7, 2014 email attaching "Briefing Note On Pacific Andes Group" examining "Suspicious Trading Activities" involving Solar Fish).

2014 email: "banking are concerned with provisional liquidation strategy. We need to be on the same page.").

43.      At the end of 2014, HSBC demanded repayment from the Pacific Andes Group of all of its outstanding trade and bilateral revolving credit facilities. Debtors complied, repaying approximately $102,177,000 by December 31, 2014 (the "HSBC Paydown")—leaving only the $96,503,494 in outstanding principal owing to HSBC under the Club Facility.

44.      The aggressiveness with which HSBC pursued repayment of its loans distinguished it from other Club Lenders. In January 2015, HSBC's Head of Banking, Hong Kong, Dai Kitamura, acknowledged HSBC had "been the most difficult bank within the core banking group."[15]

45.      HSBC kept from the Club Lenders the extent of its collection efforts in 2014 with respect to HSBC's bilateral lending relationships with the Pacific Andes Group. On December 30, 2014, HSBC's Donna Duke met with Ng Joo Sang from the Pacific Andes Group, the day after which the Pacific Andes Group remitted "the sum of US$65 million to your Bank in full settlement of the outstanding amount under the bilateral loan …. three months earlier than we have promised."[16] After receiving the funds, Ms. Duke advised HSBC's Mark T. McKeown that "this result has only come about from me going to a meeting with him yesterday …. he took us seriously yesterday."[17] During that meeting, Ms. Duke was introduced as "the new manager of the relationship." Ms. Duke "asked about the current position of the other banks—are they requesting repayment and are they being repaid[?]," to which Mr. Dennis Chan, the Pacific Andes Group's financial controller, replied that "all banks remain supportive and none are

---

[15]      HSBCHK-TR-00008104.

[16]      HSBCHK-TR-00045207, 45209.

[17]      Id. at 45208.

requesting repayment and all trade and revolving facilities remain available." During the

meeting, when Mr. Ng recounted to Ms. Duke a conversation he had earlier that year with

HSBC's Gordon W. French (General Group Manager, Head of Global Banking and Markets,

Asia-Pacific) about "confidentiality" and avoiding "leakage to the club loan facility banks that

this is being managed in HSBC's risk area," Ms. Duke replied "that in light of the proposed full

repayment of the bilateral facilities, HSBC could likely agree that the Banking managers would

continue to front the relationship to the club lenders."[18]

### 3.    November 10, 2015: Eighth Amendment

46.    On November 10, 2015, the Club Lenders executed the eighth amendment and

waiver relating to the Club Facility (the "Eighth Amendment") pursuant to which, among other

things, (a) the Club Borrowers and guarantors made certain acknowledgments about prior

representations concerning long term supply contracts and (b) CFGL agreed to search for a Chief

Restructuring Officer and confer with the Club Lenders regarding the appointment of an

investment banker by November 2015 to assist with the sale of the Peruvian Business.

47.    At that time, representatives of Rabobank, Agent for the Club Lenders, visited

Lima, Peru. Local management made presentations to representatives from Rabobank and

Deloitte regarding the fishmeal business and expected trends for the upcoming anchovy seasons.

48.    Rabobank also attended a meeting with management and BCP. At that meeting,

one of BCP's representatives asked for an update from Deloitte and Rabobank regarding the

---

[18]    HSBCHK-TR-00045207, 45211-45212 (Donna Duke notes from December 30, 2014 meeting at Hong
Kong office of Pacific Andes International Holdings Ltd.: "NJS asked who is looking after the club facility
exposure if the bilateral exposure is repaid? He said to DD that 'if you are fronting this the other banks will
change their view and do you want to kill us? I want a truthful answer from you.' NJS went on to say that
when he spoke to Gordon French earlier this year he spoke about confidentiality and if there is leakage to
the club loan facility banks that this is being managed in HSBC's Risk area, it will kill things. HSBC is not
a small bank. DD agreed with NJS's assessment of the perception this would create and said that in light of
the proposed full repayment of the bilateral facilities, HSBC could likely agree that the Banking managers
would continue to front the relationship to the club lenders."). Ms. Duke no longer works for HSBC and
currently works in London.

14

status of payments under the Club Facility. A Rabobank representative confirmed "that discussions were happening and that a 1-year extension was probable."[19]

### D.    NOVEMBER 25, 2015: HSBC INITIATES EX PARTE LIQUIDATION PROCEEDINGS

49.    HSBC did not present the FTI Report to the Hong Kong Court in October 2014. Instead, it focused at that time on compelling the Pacific Andes Group to repay its other bilateral facilities with HSBC. After those bilateral facilities were repaid, HSBC turned to the Club Facility.

50.    On November 20, 2015, Mel Blackford, the Global Head of Commercial Banking Fraud Risk at HSBC, explained that HSBC "need[ed] forensic evidence to make an urgent application to" the Hong Kong Court in order to "maximise the recovery" for HSBC on its $100 million exposure.[20]

51.    On November 25, 2015, HSBC initiated an action in the High Court of the Hong Kong Special Administrative Region (the "Hong Kong Court") seeking (1) the winding up of CFGL and CFIL (the "Winding Up Petition"), and (2) the ex parte appointment of joint provisional liquidators (the "JPL Application").

52.    HSBC filed the JPL Application and Winding Up Petition on an ex parte basis and without any notice to the CF Group, the Pacific Andes Group, or the other Club Lenders. Also HSBC did not provide the type of undertaking with respect to damages that is ordinarily provided in the context of ex parte applications.

53.    On November 25, 2015, the Hong Kong Court held a hearing on the JPL Application, which was attended solely by representatives of HSBC. On that day, and based

---

[19]    Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 30. Mr. Paniagua is located in Peru but has submitted declarations in this Court and appeared to testify.

[20]    HSBCHK-TR-00008868.

upon the representations made by HSBC in the JPL Application, the Hong Kong Court granted

the JPL Application and appointed Messrs. Beighton, Middleton, and Power of KPMG to serve

as the JPLs for CFGL and CFIL (the "Hong Kong JPLs").

54.    Some or all of the Hong Kong JPLs are the same individuals who had been

working through KPMG as purportedly "independent" financial advisors to the CF Group's

lenders since September 2015 at the request of HSBC.  Yet two weeks prior to their appointment

by the Hong Kong Court, in November 2015, Messrs. Beighton, Middleton, and Power signed

their "formal consents and affidavits to court to act as provisional liquidators"[21] for CFGL and

CFIL at the behest of HSBC.

55.    Upon information and belief, HSBC's legal counsel, Clifford Chance, terminated

its representation of HSBC and became counsel to the JPLs.  In addition, Linklaters LLP

previously served as legal counsel to the JPLs and now represents HSBC.[22]

56.    HSBC had originally requested that KPMG be retained as independent financial

advisors on behalf of the Club Lenders in October 2015.[23]  It was now executing on the plan it

devised a year earlier in November 2014 to install KPMG as provisional liquidators over certain

members of the CF Group.[24]

57.    Knowing that the Peruvian OpCos were the CF Group's most valuable assets,

HSBC initiated the liquidation proceeding and sought the appointment of the Hong Kong JPLs

over CFIL and CFGL with the intention of taking control of the Peruvian OpCos.

---

[21]    Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 65.  Ms. Ng lives in Hong Kong but has submitted Declarations in this Court and appeared to testify.

[22]    HSBC-HK-TR-00009384.

[23]    Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 53 ("In October 2015, certain lenders and in particular, HSBC, specifically requested that KPMG be retained as independent financial advisor for the benefit of all lenders of the China Fishery Group to review the work conducted by Deloitte Financial Advisory.").

[24]    HSBCHK-TR-8319; HSBCHK-TR-9046.

58.    Instead of presenting the "forensic evidence" that HSBC's Mel Blackford

conceded was needed to make the urgent application to the Hong Kong Court, HSBC relied on

the FTI Report to make the JPL Applications.  The FTI Report, however, did not provide a

legitimate basis upon which HSBC could support the JPL Applications.[25]

59.    ████████████████████████████████████████████████

████:[26]

---

[25]    See Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern
District Of New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶ 114
(negotiations concerning Initial Proposed Divestment of CF Group for $1.6 to $1.7 billion were derailed by
appointment of Hong Kong JPLs which action "would ultimately be found to be without merit"); ¶ 115
("Upon receipt of HSBC's application, the Hong Kong Court, in light of the duty of a party to disclose all
material facts (and without HSBC's flagrant breach of this duty), granted on an interim basis appointment
of three joint provisional liquidators …. [who] were the KPMG partners who were serving as financial
advisors to the Club Lenders in respect of the CF Group restructuring); ¶ 116 ("[T]he JPLs ignored the
conflicts of interest that existed under applicable law as a result of KPMG's role as financial advisor to the
Club Lenders which, at the time of their appointment, had not yet been terminated.  They also neglected to
disclose this dual role to the Hong Kong Court …. In addition, KPMG serves as auditors to certain other
companies in the Pacific Andes Group, which KPMG also neglected to disclose to the Hong Kong Court");
¶ 118 ("HSBC's application was based on transactions involving PAIH and PARD.  These allegedly
suspicious transactions had nothing to do with CFGL or the other Debtors."); ¶ 118 & n. 8 ("The facts
which HSBC claimed supported their allegations of impropriety were based on … [the FTI Report] which
were, in turn, based on outdated and limited information that was at least 18 months old, and was not
verified or discussed with management of PAIH, PARD, or the CF Group.  The only information the FTI
Report utilized was provided by HSBC or was otherwise publicly available.  HSBC had also not informed
FTI that it had intended to use the FTI Report for the purposes of its application and FTI had not prepared
the FTI Report for such purpose.  Indeed, the FTI Report expressly stated that FTI had not arrived at any
conclusion.  The FTI Report was delivered to HSBC more than 12 months before HSBC made the
application for the appointment of the joint provisional liquidators.")); see also August 23, 2016 Ng
Declaration (Dkt. 105) at ¶ 64 ("Upon HSBC's initial application, the Hong Kong Court, based in part upon
the failure of HSBC to disclose all material facts (and without knowledge at the time of HSBC's failure to
do so), granted on an interim basis an order for the appointment of three joint provisional liquidators.  In
addition, HSBC filed a subsequent action in The Cayman Islands based on the Hong Kong proceedings.");
¶ 79 ("Ultimately, after a multi-day trial on whether the appointment of the JPLs should be continued, the
Hong Kong Court ruled in favor of our companies and discharged and terminated the JPLs on January 5,
2016.  The court vindicated the China Fishery Group and found that the JPLs should not have been
appointed over CFGL and CFIL.").  Mr. Yee lives in Hong Kong, but has filed declarations with this Court
and appeared to testify here.

[26]    HSBCHK-TR-00000260, at 278 ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████

---



60.    The FTI Report could not credibly form the basis of its JPL Application because, among other things, the FTI Report was based on limited information that was at least a year old and that related to PAIH, PARD—not the Peruvian OpCos. ██████████████████████████

██████████ .[27]

---

[27]        Id. (HSBCHK-TR-00000260, at 278).



61.

---

28    Id. (HSBCHK-TR-00000260, at 281).

62.     Under Hong Kong law, it is the duty of the party making the ex parte application to (i) make proper enquiries before bringing the application; and (ii) bring to the court's attention all facts material to the determination of the party's right to that injunction as well as any points that could have been made by the defendant.  It is no excuse for the party to maintain that it was not aware of the importance of any facts which it omitted.

63.     HSBC knew the Peruvian Business was not involved in the conduct that was the focus of the FTI Report.  Indeed, HSBC's internal documents reflect an understanding that the Peruvian Business was "well managed."[29]  An internal HSBC File Note dated November 24, 2015, the day before HSBC made its ex parte application to the Hong Kong Court, noted "Deloitte opined that Peruvian operations are well run business."[30]

64.     The HSBC File Note also shows that HSBC was well aware of the status of the ongoing sale process relating to the Peruvian Business before it commenced liquidations in Hong Kong.  HSBC was kept apprised of significant details concerning the sale effort, and was notified that as of November 24, 2015, (a) ten industrial players had expressed interest; (b) five groups of financial investors had expressed interest; (c) those five potential financial buyers had a deadline

---

[29]     HSBCHK-TR-00039216, 39219 (Deloitte presentation).

[30]     HSBCHK-TR-39212.

of December 15, 2015 to submit a signed MOU; and (d) the deal structure under contemplation

was based "upon USD1.7bn Enterprise Value."[31]  As set forth in the HSBC File Note:

**S.  Sale Process Update**
- Industrial players
  - o  10 have expressed interest. Most are PRC listed companies in commodities trading and animal feed business.
  - o  CFG size is acknowledged too large for any one single investor to absorb therefore likely to partner with financial investors.
- Financial Investors
  - o  At least 5 groups of consortiums has expressed strong interest. Investors cover PE funds, SOE backed funds and  private PRC enterprises.
  - o  Strategy to relist assets on A share market or sale to strategic players in China.
- Banks
  - o  PRC lenders have begun analysis of financial performance and deal structure
  - o  Will likely partner with Chinese investors to fund the deal.
  - o  One bank has already visited Peru last week.
- Advisors
  - o  JPM, GS, MS have rejected opportunity to act for CFG given regulatory investigations
  - o  3 are still in discussions: CITIC/CLSA has submitted proposal and pitched deal. UBS and BNP have been contacted and are evaluating the opportunity.
- Contemplated deal structure
  - o  Based upon USD1.7bn Enterprise Value, split USD980m equity and USD720m debt
  - o  Step 1:
    - ▪  CFG to inject Peruvian core operating asset to a 100% owned newco (quota, fishing vessels, processing plants).
    - ▪  CFG to sell 60% of equity in CFG for USD400m to buying consortium.
    - ▪  New lenders are to provide c. USD720m of new debt to newco, with proceeds to be applied to repay existing lenders (USD418m club loan, USD296m senior loan)
  - o  Step 2:
    - ▪  Core operating assets business will be injected into a PRC A listed company for USD980m for 100% equity in cash & shares.
    - ▪  If this does not work there is a supposedly a put option to force CFG to sell the remaining 40% interest in Newco for USD580m to the purchasing consortium in 2 years time
  - o  Timing for 5 potential financial buyers:
    - ▪  By Dec15:        MOU signing and interim financing
    - ▪  By Feb16:        NDA, Data Room, Identify 2 buyers
    - ▪  By May16:       SPA signing, negotiate SPA, sign SPA
    - ▪  By Jul16:         Financial close transaction
  - o  Valuation rationale
    - ▪  USD1.7bn EV assumes 7 year CF forecast, with perpetuity rate (g=2.5%)

65.    In light of its duties under Hong Kong law, HSBC should have brought the

following facts to the Hong Kong Court's attention, among others:  (i) HSBC's application was

based on a report that focused on transactions involving PAIH and PARD, not CFGL or CFIL

(the entities over which HSBC applied for the appointment of liquidators); (ii) HSBC knew the

Peruvian Business was well-run; (iii) the FTI Report was based on outdated and limited

---

[31]      HSBCHK-TR-39212, 39213.

information; (iv) the FTI Report was not prepared for purposes of the JPL Application; (v) the

FTI Report was delivered to HSBC more than twelve months before HSBC made the JPL

Application; (vi) the other Club Lenders did not support the JPL Application; (vii) the beginning

of the fishing season had just begun in Peru, and granting the JPL Application could harm the

operations of the Peruvian OpCos; and (viii) a sale process was underway, the details of which

HSBC was familiar—including potential bids and upcoming deadlines, and granting the JPL

Application could harm that process.

66.     On November 25, 2015—the same day HSBC made its <u>ex</u> <u>parte</u> JPL Application

to the Hong Kong Court—HSBC filed papers in the Grand Court of the Cayman Islands (the

"<u>Cayman Court</u>") seeking a similar order for the appointment of joint provisional liquidators (the

"<u>Cayman JPL Application</u>" and together with the JPL Application, the "<u>JPL Applications</u>").[32]

67.     Notably, Mel Blackford, the Global Head of Commercial Banking Fraud Risk at

HSBC, declined to provide evidence in connection with HSBC's application to the Cayman

Court.

---

[32]     While the Cayman Petition referenced the December 30, 2014 meeting between Ms. Duke and Mr. Ng, █
████████████████████████████████████████████████
██████████████████████ Cayman Petition <u>¶ 51</u>.

68.     Following a hearing on December 8, 2015, the Cayman Court appointed Mr. Beighton, Mr. Power, and Alexander Lawson (also of KPMG) to serve as provisional liquidators over CFGL (the "<u>Cayman JPLs</u>" and together with the Hong Kong JPLs, the "<u>JPLs</u>").

69.     HSBC's action in the Cayman Islands was based in large part on, and depended on, the interim findings and rulings of the Hong Kong Court.

E.    CLUB LENDERS DID NOT SUPPORT LIQUIDATION PROCEEDINGS

70.     HSBC's appointment of the JPLs came as a "surprise" to the Club Lenders who considered it a "drastic" move that was "premature."[33]

71.     The absence of Club Lender support for the liquidation proceedings confirms further that the JPLs' appointment was not necessary to protect creditor interests or avoid the dissipation of assets.

72.     The Club Lenders were reluctant to initiate any legal actions at that point.  For example, on November 24, 2015, when China CITIC learned that Bank of America, N.A. had issued a demand letter to Pacific Andes, China CITIC stressed to the Club Lenders that "[a]ny legal action is not beneficial to the bank group[']s recovery.  Please consider giving more time to the Borrower to orderly sell the assets."[34]

73.     According to press reports, on December 1, 2015, the Club Lenders attended a presentation at FTI's offices where FTI explained the contents of the FTI Report, which served as the basis for HSBC's JPL Applications.  The following day, China CITIC informed HSBC that it did not support the petition to wind up CFGL because it would "seriously affect the disposal of the Peru assets to an investor who is in advance[d] negotiations with CFGL and will

---

[33]     Trustee Dec. at 20.

[34]     HSBCK-TR-00039195, 39196.

destroy the value of Peru assets."[35]

74.    The Club Lenders were especially suspicious of HSBC's reliance on the FTI

Report as a basis for the Hong Kong and Cayman applications when HSBC had been in

possession of the report for more than a year.  The Club Lenders suspected that HSBC had

waited a year to file the JPL applications so that HSBC could extract repayment of its bilateral

indebtedness from the Pacific Andes Group companies in the interim.[36]  In addition, these Club

Lenders questioned the appointment of KPMG as the Hong Kong JPLs because they previously

carried out certain advisory work on behalf of the Club Lenders.[37]

75.    On December 1, 2015, Rabobank's Chief Risk Officer Bernie Nissen told HSBC

and the other Club Lenders that there was no "urgent need" to commence a parallel application

in Cayman and that HSBC's Hong Kong action was "not fully considered and should in any

event have been done in consultation with the wider group of lenders."[38]

76.    On December 4, 2015, Rabobank's Chief Risk Officer for Asia, Willem

Borgmeier, submitted an affidavit to the Hong Kong Court on behalf of all Club Lenders other

than HSBC (i.e., Rabobank, DBS, Standard Chartered, and China CITIC) explaining the other

Club Lenders recognized the harm caused by the appointment of the JPLs—namely, the "actual

or perceived impediment to a sale of the Peruvian assets"—stating that "the appointment of

provisional liquidators at CFIL and CFGL has caused significant instability both with the local

management and with the local Peruvian lenders who provide working capital finance."  Mr.

---

[35]    HSBCHK-TR-00005339.

[36]    HSBCHK-TR-00020224, 20226 ("The lenders have been suspicious of HSBC because the bank had since November 2014 possessed the FTI Report (which suggests that there is fraudulent trading activity with the Pacific Andes Group) but the bank waiting a full year to act on the FTI reports contents by winding up the company.  The lender group alleges that HSBC waited a year to wind up the company so that a large portion of the debt that was owed to it by China Fishery could be repaid.").

[37]    HSBCK-TR-00039343, 39346 (¶ 12).

[38]    HSBCHK-TR-00041581, 41582.

Borgmeier explained that "[t]hese facilities are critical to enable the Company to continue trading during the current fishing season and to maintain the business and assets as a going concern which is considered to be in the best interests of all stakeholders."[39]

77.    On December 4, 2015, the Club Lenders proposed an "alternative solution" to the appointment of the JPLs at CFGL and CFIL which they believed would protect the Club Lenders and other stakeholders by providing a means to monitor CFGL's operations, while simultaneously reducing the risk of destruction to the value of the Peruvian Business and promoting the sale process.[40]

78.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████[41]

79.    The Club Lenders' view reflected that of Deloitte, the financial advisor engaged by the Debtors to provide transparency to the Club Lenders.  Deloitte reached out directly to HSBC to discuss how the FTI Report did not relate to the Peruvian OpCos and "how the value of the [Peruvian] Fishmeal business can be maintained and the business sold;" to note "the Peru based management appear to be completely separate from the Hong Kong business operations and transactions," and "the Peru business is and can be ring fenced;" and to stress they "should all work to find a structure and sale process which you and all lenders are comfortable with and which mitigates the risks of destroying value being extracted from the sale of the Peruvian Fishmeal assets.  I do not believe a sale by an Insolvency Practitioner led process is going to do

---

[39]    Affirmation of Willem Borgmeier, dated December 4, 2015 (Dkt. 58-9).

[40]    Trustee Dec. at 20.

[41]    HSBCHK-TR-00000260, at 279-80.

this."[42]

80.    On January 7, 2016, HSBC acknowledged internally that "the company and other banks are still trying to seek an agreement from HSBC to withdraw its actions."[43]

81.    HSBC similarly noted internally that "[o]ther Club Lenders have indicated a preference for a consensual resolution and have supported the companies in seeking removal of the PLs.  The outcome is uncertain at this point in time."[44]  As the JPL's counsel observed, "there is a substantial majority of those CF creditors which express a view which support management regaining control …. because of a perception that management are somehow more likely to procure an outcome which produces a significant return to creditors of PARD and PAIH."[45]

### F.    LIQUIDATION PROCEEDINGS HARM PERUVIAN OPERATIONS

82.    The fishing season began on November 17, 2015, just eight days before HSBC caused the JPLs to be appointed and the lowest point in the CF Group's annual cash cycle.

83.    The Hong Kong JPLs wasted no time in proceeding as HSBC's surrogates to wrest control of CFG Peru and the Peruvian OpCos from local management in Peru and consummate a prompt sale of the CF Group so that HSBC's portion of the Club Facility could be satisfied.

84.    The Hong Kong JPLs traveled to Peru to meet with local suppliers and lenders to the Peruvian OpCos.

85.    On or about November 30, 2015, the Hong Kong JPLs, together with their Hong Kong counsel, met with BCP—the Peruvian OpCos' primary working capital provider—without

---

[42]    HSBCHK-TR-00014495, at 14497.

[43]    HSBCHK-TR-00010019.

[44]    HSBCHK-TR-00032745, 00032748.

[45]    HSBCHK-TR-00018953, 18955.

anyone from the CF Group present.

86.    Shortly after the Hong Kong JPLs met with BCP, BCP suspended its $100 million facility.  The main reason for its suspension of the facility was the appointment of the JPLs.[46] BBVA and Scotia Bank also suspended their facilities.

87.    Management in Peru had no alternative but to secure alternative financing with a competitor to the Peruvian OpCos (a fishmeal company named Hayduk).  This alternative financing, however, came at a significantly increased cost.

88.    The financing alternatives were not sufficient to meet the CF Group's needs, severely hampering operations and resulting in lost revenues.  Losses also were incurred because the CF Group was forced to suspend a renovation project to increase capacity at one of its plants, which precluded the plant from processing any fishmeal.

89.    The 2016 revenue of the Peruvian OpCos as of June 30, 2016 was $114.8 million, with EBITDA of approximately $22.1 million, which was worse than the financial performance of the Fishmeal Companies during a normal fishing season.[47]

90.    In a letter dated December 7, 2015, the Hong Kong JPLs attempted to take control of CFG Peru and its assets, threatened local management in Peru with potential personal liability if they did not comply with their demand to convene shareholders meetings and appoint new representatives.  The letter advised that the "Company's assets … include all assets of CFG Peru Investments and its subsidiaries" and warned that "[s]hould you in any way facilitate any action by the Board of Directors [of CFGL] in relation to these subsidiaries without first notifying and

---

[46]    Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 34 ("During the evening of November 30, 2015, the JPLs met with BCP without anyone from the Peruvian Companies present.  Soon after the JPL's arrival in Peru, BCP suspended our $100 million credit line and allowed us to borrow only $8 million in short term inventory financing."); August 23, 206 Obj. (Dkt. 103) ¶ 33 ("As a result of the appointment of the JPLs and their actions, BCP reduced availability to only $8 million and the Fishmeal Companies' other local lenders stopped funding altogether.").

[47]    Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 45.

obtaining the consent of the JPLs, we again reserve our rights to hold you personally liable."[48]

### G.    HONG KONG COURT DISMISSES HSBC'S JPLS; HSBC SECURES UNDERTAKING

91.    Over four days in December 2015 and January 2016, the Hong Kong Court held an evidentiary hearing to consider the merits of HSBC's application to appoint JPLs over CFGL and CFIL.  Thereafter, on January 5, 2016, the Hong Kong Court discharged and terminated the Hong Kong JPLs' appointment.  The Hong Kong Court found that the Hong Kong JPLs never should have been appointed over CFGL and CFIL to begin with and that HSBC failed to present credible evidence justifying the appointment of the JPLs in the first place.[49]

92.    The Hong Kong Court's decision discharging the JPLs was issued by Deputy High Court Judge Kenneth Kwok, SC on January 5, 2016, and the Reason for Decision was handed down on March 17, 2016 (collectively, the "Hong Kong Court Decision").  The Hong Kong Court Decision was filed under seal, and HSBC will not agree to have it unsealed.

93.    HSBC was not surprised at the Hong Kong Court's decision to discharge the Hong Kong JPLs and expected it would happen—though concern was expressed internally that the discharge would cause reputational damage to the bank.

---

[48]    Letter dated December 24, 2015 (Dkt. 99-1) ("KPMG representatives have replaced the previous directors of CFG Peru Investments Pte. Ltd ('CFG Singapore') and, therefore, we now have control over CFG Peru Singapore … [and the Peruvian Subsidiaries]").

[49]    See Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern District Of New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶¶ 114-18; see also August 23, 2016 Ng Declaration (Dkt. 105) at ¶¶ 64, 79.

94.    Despite having been dismissed by the Hong Kong Court on January 5, 2016, the Hong Kong JPLs did not step down immediately and instead sent letters to the Peruvian management team on January 6 and January 11 continuing to demand that local management call a shareholders meeting.

95.    HSBC also threatened to appeal the dismissal of the Hong Kong JPLs and to proceed with the Winding Up Petition in Hong Kong.  And, even though HSBC commenced the Cayman Islands action based in large part on the initial findings of the Hong Kong Court, HSBC insisted on proceeding with the winding up petition in the Cayman Court.

96.    HSBC imposed onerous demands on CFGL and CFIL in exchange for a six-month suspension of the Cayman winding up petition and dismissal of the appeal from the Hong Kong Court order terminating the Hong Kong JPLs.  Rabobank (a similarly situated Club Lender) complained that "HSBC has so far not moved on any major points with the company providing concessions."  In response, the HSBC employees overseeing negotiations agreed that HSBC "need[s] to keep our foot on their throats here…".[50]

97.    During these negotiations, the other Club Lenders were "deeply suspicious" of HSBC's motives.[51]  These negotiations culminated in the execution of a Deed of Undertaking, dated January 20, 2016 (the "HSBC Undertaking"), pursuant to which, inter alia, CFGL and CFIL agreed to pursue a sale of the Peruvian Business to be completed by July 15, 2016 and to

---

[50]    HSBCHK-TR-00010048, 10052.

[51]    HSBCHK-TR-00020224, 00020226 ("HSBC's proposal for Borrelli Walsh to be appointed made the club lenders—already deeply suspicious of HSBC motives—even more suspicious.  This is because, among other things, Donna Duke is leaving HSBC for Madison Pacific, which is very close to Borelli Walsh, which among other things is a shareholder of Madison Pacific.").

appoint Paul Brough as Chief Restructuring Officer ("CRO") to oversee the sales process.  They

also agreed to pay $3.1 million to KPMG for the fees of the Hong Kong JPLs—before the court

approved those fees and notwithstanding HSBC's agreement to indemnify the JPLs.[52]  Failure to

comply with the HSBC Undertaking entitled both HSBC and Bank of America, N.A. (which was

not a signatory, but was a beneficiary to the HSBC Undertaking) to "be at liberty to apply to the

Cayman Court for the immediate reappointment of the JPLs … and the CF Parties hereby

consent to such appointment."[53]

98.     Given the continuing damage to the Peruvian Business caused by unresolved

foreign liquidation proceedings, HSBC had put "a gun to [the] head" of the Pacific Andes

Group.[54]

99.     As explained in an internal HSBC email, the CF Group "acquiesced at the 11th

hour" before the liquidation hearing in the Cayman Islands.  Mark Mckeown, HSBC's Chief

Risk Officer, Asia Pacific, observed that "[g]iven the pressure we have had from other creditors,

I think this is as good as we could hope for."[55]

100.     HSBC understood fully the level of control the undertaking provided, remarking

internally that "[w]e retain good control and can re-kick in Liquidators but they still have to sell

the asset …."[56]

101.     HSBC improperly secured the JPLs' appointment by violating its duty of full and

frank disclosure to the Hong Kong Court.  Understanding that all parties appreciated the damage

caused by ongoing liquidation proceedings, HSBC weaponized the JPLs' appointment, its ability

---

[52]     HSBCHK-TR-00019439, HSBCHK-TR-00019468, 00019469.

[53]     Trustee Dec. at 23-24.

[54]     August 29, 2016 Hr. Tr. at 198:12 (Dkt. 157).

[55]     HSBCHK-TR-00003606.

[56]     HSBCHK-TR-00003606.

to continue the Cayman winding up petition, and its ability to appeal the Hong Kong JPLs'

dismissal, in order to secure repayment of its loan and specifically to extract concessions in

negotiating the HSBC Undertaking in January. Through that undertaking, HSBC retained

control over CFGL and the entire CF Group by extension as well as the sale process for the

Peruvian Business.

### H. STIGMA OF LIQUIDATION PROCEEDING LINGERS AFTER JPLS ARE DISMISSED

102. Following dismissal of the Hong Kong JPLs, management in Peru met with local

Peruvian banks in an attempt to reinstate inventory financing, without which the Peruvian OpCos

could not support operations for the upcoming season. Moreover, employees were threatening to

strike for lack of payment, and overdue taxes and delinquent supplier accounts needed to be

satisfied.

103. As Mr. Brough explained in an email to the Club Lenders on February 19, 2016,

"[t]he Peruvian business has been without working capital for almost three months … due to the

appointment of the JPLs" as well as the suspension of certain interest payments, i.e., the interest

payments of the 9.75% Senior Notes due 2019.[57] The Hong Kong Court's appointment of the

Hong Kong JPLs triggered a cross default with respect to the 9.75% Senior Notes due 2019

which are guaranteed by CFG Peru.

104. Mr. Brough similarly acknowledged that "[t]he Peruvian banks which previously

supported the Peruvian Business' working capital needs have been shaken, firstly by the

appointment of the JPLs and secondly by the default of the Notes."[58]

105. Given the inability of the Peruvian OpCos to obtain long-term financing, Mr.

Brough requested the Club Lenders provide up to $25.5 million of new financing to sustain

---

[57]    HSBCHK-TR-00007076.

[58]    HSBCHK-TR-00007026.

operations through the first fishing season of 2016.  HSBC declined to participate in this funding,

despite the fact that it was considered necessary by the individual HSBC selected to serve as

CRO.  HSBC instead contemplated another threat to institute liquidation proceedings.[59]  Mr.

Brough described HSBC's conduct as "unprofessional."[60]

106.     Ultimately, on June 30, 2016, involuntary proceedings to restructure and/or

refinance the debts of the Peruvian Companies were commenced before El Institute Nacional de

Defensa de la Competencia y de la Proteccion de la Propiedad Intelectual (the National Institute

for the Defense of Competence and Protection of Intellectual Property, also known as

"INDECOPI") under the laws of the Republic of Peru and in particular, the General Law of the

Bankruptcy System (Law No. 27809) (the "Peruvian Insolvency Law").

107.     HSBC sent letters to INDECOPI in August 2016 (even though creditors are not

supposed to participate in the proceedings until they are recognized formally).  It also attempted

to have CFGI's and Copeinca's INDECOPI proceedings withdrawn by buying certain creditors'

claims against them.[61]

**I.     HSBC INTERFERES WITH SALE PROCESS**

108.     In the fall of 2015, before HSBC applied for the appointment of the Hong Kong

JPLs, Pacific Andes Group management was contemplating a measured and deliberate process

for the sale of the Peruvian Business to address its debt burden and to preserve and maximize

value.

---

[59]     HSBCHK-TR-00007375 ("My view is that we should continue to take a hard stance here and may have to
be prepared to reinstate the PL's; or at least threaten such").

[60]     Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 91.

[61]     Notice of Subsequent Information Pursuant To § 1518 Of Bankruptcy Code (Dkt. 18 (Case No. 16-11891))
¶¶ 5-8.

109.    At a presentation made by Deloitte on September 25, 2015, Deloitte valued the assets of the Peruvian OpCos at $1.69 billion.

110.    According to materials prepared by Deloitte in mid-November 2015, an investment bank was being appointed to run a sale process, and during the week of November 15, 2015, a potential buyer of the Peruvian fishmeal business was performing a site visit.[62]

111.    At the start of the sale process, CITIC CLSA valued the Peruvian Business at $1.7 billion.[63]

112.    As HSBC's File Note from November 24, 2015 confirms, at that time, there were several interested parties and the deal structure contemplated an enterprise value of approximately $1.7 billion.[64]

113.    In November 2015, Pacific Andes management was in advanced negotiations with two investment groups regarding the acquisition of some or all of the CF Group.  ████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████.[65]

---

[62]      HSBCHK-TR-00009826.

[63]      Trustee Dec. at 29.

[64]      HSBCHK-TR-39212, 39213.

[65]      HSBCHK-TR-00000260, at 267; at 278 █████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████



114.    The appointment of the Hong Kong JPLs and the specter of liquidation altered the

environment in which the sale was being conducted, inviting lower bids.  For example, ▮



115.    HSBC knew its actions would depress the values that could be obtained for the

Peruvian Business through a deliberate sale process.  Specifically, HSBC's Mel Blackford

understood that proceeds from a sale of the Peruvian Business would now be lower, noting

"[t]his action will protect our [HSBC's] position but it is very bad news indeed for the creditors

---

[66]    HSBCHK-TR-0000260, at 279-280.

owed USD 1.2bn by the Opcos."[67]

116.    In addition to the alteration of the sale environment brought about by HSBC's commencement of liquidation proceedings in Hong Kong, the compressed time frame imposed by HSBC in the HSBC Undertaking chilled bidding.

117.    HSBC knew that even in a rushed sale consummated by liquidators, the value realized for the Peruvian Business would satisfy its portion of the Club Facility.  HSBC noted internally that its January undertaking provided "unopposed authority for HSBC to liquidate the company should a trigger even occur, including the resignation of the CFO, or advice from the CRO that the sale process is being delayed or frustrated by the directors.  We believe this is a good outcome for HSBC and the other creditors of CFG.  The asset has more than enough value to see us repaid in full …"[68]

118.    On March 15, 2016, HSBC's Mr. Mckeown explained the message that should be delivered to Mr. Brough:  "if [the CF Group does] not deliver we will do what is necessary, including [re]instituting the [JPLs]; the other lenders can take us out if they wish."[69]

119.    By June 1, 2016, seven non-binding expressions of interest had been received for the Peruvian Business, and more than half of the bids were considered to be worth progressing to the second round of the sale process.  One of the expressions of interest was for $1.5 billion--$200 million below the pre-appointment indication of interest that nearly resulted in a memorandum of understanding—but the indicating party refused to take the necessary next steps to sign a "process letter" to proceed to the next round of the sale process.  The remaining non-

---

[67]    HSBCHK-TR-00008874.

[68]    HSBCHK-TR-00013710.

[69]    HSBCHK-TR-00007376.

binding expressions of interest that were received were for much lesser amounts.[70]  Indeed, at

that time, HSBC "expect[ed] to receive a price starting with a 9"[71]—a significantly lower

number from the $1.7 billion under consideration before HSBC capriciously commenced the

liquidation proceedings.

### J.    CHAPTER 11 CASES COMMENCED IN NEW YORK

120.    On the Petition Date, June 30, 2016, the Debtors, including CFG Peru, filed

voluntary petitions with the Court for relief under chapter 11 of the Bankruptcy Code.

121.    On October 28, 2016, the Court granted the motion of Rabobank U.A., Standard

Chartered, and DBS seeking the appointment of a chapter 11 trustee pursuant to section

1104(a)(2) of the Bankruptcy Code (Dkt. 203).  On November 10, 2016, the Court confirmed the

appointment of William A. Brandt, Jr. as the chapter 11 trustee for CFG Peru (Dkt. 219)

122.    When appointing the Trustee, the Court observed that CFG Peru "is the 100%

direct and indirect owner of the Peruvian OpCos" and that "[w]hatever value [the Debtors] have

is derived from their mostly indirect interests in the Peruvian operating companies."  The Court

also found "the Debtors have no prospect of rehabilitation if they cannot realize value from their

interests in the Peruvian OpCos."  The Court charged the Trustee with, among other things,

evaluating "the optimal way to maximize the value of the Peruvian Business and to determine

how to realize that value for the benefit of the Debtors' estates and creditors."  See In re China

Fishery Grp. Ltd. (Cayman), No. 16-11895 (JLG), 2016 WL 6875903, at *2, *20 (Bankr.

S.D.N.Y. Oct. 28, 2016).

123.    In addition to owning the equity in the Peruvian OpCos, CFG Peru is a creditor

and party in interest in the same chapter 11 cases in which HSBC filed proofs of claims.  CFG

---

[70]    Trustee Dec. at 26-27.

[71]    HSBCHK-TR-00018131.

Peru and HSBC each filed proofs of claim in the chapter 11 cases for CFGL (Case No. 16-11895), CFIL (Case No. 16-11896), N.S. Hong (Case No. 16-11899),[72] and Smart Group (Case No. 16-11910).  A chart detailing the proofs of claim filed by CFG Peru and HSBC is set forth in Figure 1, below.



Figure 1.  Proofs of Claim Filed in Chapter 11 Cases.

124.    On December 27, 2016, the Trustee filed a motion seeking discovery from HSBC pursuant to Federal Rule of Bankruptcy Procedure 2004.  On January 9, 2017, the Trustee filed his application to retain Quinn Emanuel Urquhart & Sullivan LLP in the jointly administered Chapter 11 Cases [ECF No. 303] and in CFG Peru's Chapter 11 Case [ECF No. 54].

125.    On January 31, 2017, HSBC filed in the jointly administered Chapter 11 Cases its Notice Of Appearance And Request For Service Of Papers [ECF No. 332] (the "Notice Of Appearance").  The Notice Of Appearance relates to "the above captioned chapter 11 cases"—

---

[72]    After it filed the Complaint, CFG Peru withdrew its claim against N.S. Hong.  See Dkt. No. 1327 (Stipulation).  CFG Peru has filed proofs of claim against other debtor entities that are located above CFGL in the capital structure, e.g., PARD (Claim No. 1774), Zhonggang Fisheries Limited (Claim No. 1534 ), and Golden Target Pacific Limited (Claim No. 1520).

38

which include CFG Peru—identifies attorneys from Davis Polk & Wardwell LLP and Boies

Schiller & Flexner LLP as counsel to HSBC, and demands, pursuant to, inter alia, section

1109(b) of the Bankruptcy Code, that they receive "all notices given or required to be given in

connection **with the Cases** ..." (emphasis added).

126.    On January 31, 2017, HSBC objected to the Trustee's application to retain Quinn

Emanuel as special litigation counsel in the jointly administered Chapter 11 Cases, arguing the

Trustee's retention of Quinn Emanuel "to investigate and potentially litigate against" HSBC

would be "both inappropriate and unwarranted."[73]  On  February 6, 2017, HSBC objected to the

Rule 2004 Motion in the jointly administered Chapter 11 Cases.[74]  In addition to opposing the

Trustee's examination, the objection HSBC filed to the Trustee's Rule 2004 Motion requested

extraneous relief unrelated to the proposed investigation.[75]  At HSBC's request, the Trustee

granted one extension with respect to HSBC's response deadline for the Quinn Emanuel

retention application.  HSBC also requested two extensions of the response date with respect to

the Rule 2004 Motion, which the Trustee granted.[76]

---

[73]    See Limited Obj. of HSBC to the Appl. Of William A. Brandt, Jr., Chapter 11 Trustee, for Entry of an
Order Authorizing Retention and Employment of Quinn Emanuel as Special Litigation Counsel at ¶¶ 2-3,
In re China Fishery Grp. Ltd. (Cayman) (No. 16-11895), Dkt. No. 333.

[74]    See Obj. of HSBC Limited to the Mot. Of William A. Brandt, Jr., Chapter 11 Trustee, for Order
Authorizing Issuance of Subpoenas to HSBC, In re China Fishery Grp. Ltd. (Cayman), (No. 16-11895),
Dkt. No. 344  (the "Retention Obj.").

[75]    See Retention Obj. at 4-5 (¶ 8) ("Discovery aside, the Court should conduct a broader review of the
progress of these chapter 11 cases and whether there is any real prospect of the Trustee and the Debtors
bringing them to an expeditious and successful conclusion."); at 5 & n. 6 (reserving right "to request
dismissal of the chapter 11 proceeding or, alternatively, to lift the automatic stay to allow foreign
proceedings to continue"); at 17 & n. 16 ("In any event, objecting to [HSBC's] Proofs Of Claim is unlikely
to bring any additional value to stakeholders in CFG Peru or the other Debtors.  Because two of the non-
Debtor Peruvian OpCos are obligors for the full amount of the Club Facility, the Club Lenders (including
[HSBC]) are entitled to be repaid in full by those entities before any equity value from the Peruvian OpCos
flows to CFG Peru or any other Debtors."); at 23 & n. 24 ("This filing constitutes [HSBC's] notice that it
intends to raise an issue about a foreign country's law.").

[76]    See First Am. Notice with respect to Retention Appl., In re China Fishery Grp. Ltd. (Cayman) (No. 16-
11895), Dkt. No. 321; First Am. Notice with respect to Rule 2004 Mot., In re China Fishery Grp. Ltd.

### K.     HSBC WAS AN INSIDER OF PACIFIC ANDES COMPANIES

127.     HSBC was an insider of the Pacific Andes Group during all relevant periods—namely, before the appointment of the JPLs; during the JPLs' abbreviated tenure; and after the Deed of Undertaking was executed.

128.     Before the JPLs were appointed, HSBC was acting in concert with the Pacific Andes Group to obtain repayment of its bilateral credit facilities and keeping from the other Club Lenders the fact that the Pacific Andes loans were being managed in HSBC's risk area.  It also started developing an internal strategy to have KPMG installed as provisional liquidators.  HSBC fortified its role as an insider when it filed the ex parte JPL Applications.  HSBC installed the liquidators to exercise control over CFGL and CFIL and the "crown jewels" of the Pacific Andes Group—i.e., the Peruvian OpCos.  And, HSBC wielded the "life or death" power it obtained by virtue of the JPLs' appointment (and its ability to appeal from the decision dismissing the JPLs) to extract the Deed of Undertaking.  As it privately acknowledged, HSBC was "keep[ing its] foot on their throats", and the Deed of Undertaking allowed HSBC to "retain good control."[77]

129.     HSBC also facilitated the appointment of its own retained professionals into control positions within the Pacific Andes Group.  Specifically, FTI, the same firm that HSBC hired to write the report it used as the basis for its unfounded JPL Applications, ultimately served as liquidators for certain Pacific Andes Group companies.  On October 31, 2016, the High Court of Justice of the British Virgin Islands, Commercial Division (the "BVI Court") appointed three joint provisional liquidators to serve with respect to Pacific Andes Enterprises (BVI) Limited:

---

(Cayman) (No. 16-11895), Dkt. No. 322 ; Second Am. Notice with respect to Rule 2004 Mot., In re China Fishery Grp. Ltd. (Cayman) (No. 16-11895), Dkt. No. 330 .

[77]     See HSBCHK-TR-00010048; HSBCHK-TR-00003606.

Mr. Ian Morton, Mr. Nick Gronow, and Mr. Joshua Taylor of FTI (the "BVI Liquidators").[78]  On

November 18, 2016, the BVI Court appointed the Liquidators to serve with respect to Parkmond

Group Limited and PARD Trade Limited after placing those companies into liquidation.[79]  One

affiliate, Richtown Development Limited, challenged the BVI Liquidators' appointment on the

ground that they had prepared the FTI Report at HSBC's direction.[80]  Notably, HSBC had

commissioned the creation of reports drafted by FTI that FTI provided to these courts to secure

its appointments.[81]

130.    On January 30, 2018, the Trustee filed a formal application with the Hong Kong

Court requesting that it unseal the 2016 Hong Kong Court Decision so that whatever findings the

court made with respect to HSBC's conduct would be publicly disclosed.  HSBC strenuously

opposed the Trustee's application and demanded that the decision must remain under seal.  The

Hong Kong Court sided with HSBC, refused to recognize the legitimacy of this Court's

appointment of the Trustee, and declined to unseal the Hong Kong Court Decision.[82]  However,

---

[78]    See Disclosure Statement for Joint Chapter 11 Plain of Reorganization of Pacific Andes International Holdings Limited (Bermuda) and Certain of its Affiliated Debtors, at 28-29 [ECF No. 801].

[79]    See id. at 29-30.  On February 13, 2017, at the requests of Maybank and Glacier Fish Company, the BVI Court appointed the Liquidators to serve with respect to Europaco Limited (BVI).  Id.  The Liquidators also serve with respect to Solar Fish Trading Limited, Palanga Limited, Zolotaya Orda Limited, Richtown Development Limited, Metro Win Inc. Limited, Alatir Limited, and Perun Limited.

[80]    See 45-BVIHC-132, 133, 134 (2016) (BVI Court Decision) at 30 ("Richtown opposed the appointment of the individuals who had acted as joint provisional liquidators on the basis that as persons from FTI consulting, they would have a conflict interest in acting.  The conflict was said to be between their duties as liquidator and their self-interest in seeking to justify the preliminary FTI Consulting reports to HSBC which were used, as I understand it, as evidence for the appointment of provisional liquidators in the Cayman Islands and Hong Kong …. [T]he individuals were professional men, and [ ] the objection to their appointment was ill-founded.")).

[81]    See, e.g., Proof Of Claim No. 63-1 (¶ 1 ("In appointing the Liquidators act, the BVI Court was aware of the two reports issued by FTI Consulting (Hong Kong) Limited dated November 16, 2015 and December 18, 2015,  (collectively, the '2015 Reports'), on the instruction of counsel for the The Hongkong And Shanghai Banking Corporation Limited, as well as two reports prepared for the BVI Court by Nicholas James Gronow, Ian Morton and Joshua Taylor as joint and provisions liquidators of PAE dated November 4, 2016 and November 17, 2017.").

[82]    HCMP 134/2018 [2018] HKCFI 2622 (Reasons For Decision) at 18:D-H ("It follows that there is no basis for recognising the Trustee's office or providing assistance to him."); at 9:L-O ("Viewed from this Court's

the Hong Kong Court did remark, when denying the Trustee's application, that the Hong Kong Court Decision found the CF Group was "involved in a restructuring exercise and that it was in the interests of 'stakeholders' that there was an orderly disposal of assets rather than a compulsory winding up and that this was a reason for discharging an order."[83]  HSBC continues to insist that the Hong Kong Court's decision cannot be reviewed by this Court or otherwise be made publicly available.

## FIRST COUNT
### Peruvian Civil Code Articles 1969 and 1985 (Malice or Negligence)

131.    The Trustee repeats and realleges the allegations in paragraphs 1 through 130 above, as if fully set forth herein.

132.    Under Article 1969 of the Peruvian Civil Code, a defendant who causes harm to a plaintiff, by either malice or by negligence, is forced to compensate the plaintiff.  The burden is on the defendant to prove that it did not act with malice or negligence.

133.    Under Article 1985 of the Peruvian Civil Code, compensation for damages includes the consequences that derive from the action or omission that generates the damage, including loss of earnings, damage to the person, and moral damage.  The amount of compensation accrues legal interest from the date on which the damage occurred.

134.    Parties filing an ex parte petition for the appointment of provisional liquidators in Hong Kong have a duty to fully and frankly disclose all material facts to the deciding court.

---

perspective the Chapter 11 filings by the Companies and the Group were, therefore, unconscionable conduct that the application to appoint the Trustee became possible"); at 20:H-Q ("It seems to me that this approach ignores the fact that the Chapter 11 proceedings, and consequently the Trustee's appointment, is the consequence of what appears to be a conscious fraud on the part of the Ng family on HSBC and this Court. Public policy considerations weigh heavily in favour of declining to provide any form of assistance to a process that arises in this way.").

[83]    HCMP 134/2018 [2018] HKCFI 2622 (Reasons For Decision) at 9:O-R; 10:F-I.  Notably, when denying the Trustee's motion to unseal the prior decision dismissing the Hong Kong JPLs, the Hong Kong Court noted that "it is not for me to assess whether or not the [Hong Kong Court] was wrong to set aside the order appointing the provisional liquidators." Id.

135.   HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte application that it either knew or should have known.

136.   Among other things, HSBC had a duty to inform the Hong Kong Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose.  HSBC should have informed the Court of the status of the sale process, with which HSBC was familiar, and that it understood the Peruvian Businesses were well run.  HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.  HSBC knew its evidence was flimsy and was not surprised that the JPLs were discharged.

137.   There was no need to appoint liquidators because there was no risk of dissipation of assets, a fact that HSBC understood and that was corroborated by the lack of support among the other Club Lenders for those proceedings, their concern that the appointment of liquidators not only damaged operations but also damaged the companies' value and obstructed the sale process, and their suspicion that HSBC did nothing with the FTI Report for more than a year while it secured the repayment of its bilateral facilities.  That suspicion was well-founded, considering that HSBC had agreed with Pacific Andes Group management to keep from other Club Lenders the fact that the Pacific Andes' loans were being managed in HSBC's risk area.

138.   Largely on the basis of the Hong Kong Court's decision, the Cayman Court also appointed provisional liquidators.

139.   The Peruvian OpCos are the cornerstone of the Trustee's restructuring efforts in the United States.  As a result of the appointment of the JPLs and HSBC's collection efforts

thereafter, including the HSBC Undertaking, the Peruvian OpCos and CFG Peru suffered

damages resulting from lost revenue and profit, increased financing costs, and lost capacity.  The

appointment of the JPLs also caused a substantial decrease in the value of CFG Peru's equity

interest in the Peruvian OpCos because it caused the companies' operations to contract and

interfered with a process for a measured and deliberate sale of those companies.

140.    Before the appointment of the JPLs, indications of interest totaled as much as $1.7

billion.  After the appointment, they were much lower—by at least $200 million.  While one

indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed

to the next round of the sale process.  The remaining non-binding expressions of interest that

were received were in much lesser amounts.  HSBC expected to receive a "price starting with a

9."[84]

141.    From and after November 25, 2015, HSBC exerted control over the CF Group by,

among other things, having the JPLs appointed, sending them as its surrogates to Peru

immediately after their appointment to attempt to take control of CFG Peru and the Peruvian

OpCos, to meet with the Peruvian OpCos' lenders in a manner that disrupted those relationships,

obtaining the HSBC Undertaking, and dictating the terms of the sale process for those entities.

### SECOND COUNT
### Peruvian Civil Code Articles 1981 and 1985 (Vicarious Liability)

142.    The Trustee repeats and realleges the allegations in paragraphs 1 through 141

above, as if fully set forth herein.

143.    Under Article 1981 of the Peruvian Civil Code, where one party directs another

party to perform an act that causes damage, both parties are subject to joint and several liability

for the damage caused.

---

[84]    HSBCHK-TR-00018131.

144.    Under Article 1985 of the Peruvian Civil Code, compensation for damages includes the consequences that derive from the action or omission that generates the damage, including loss of earnings, damage to the person, and moral damage.  The amount of compensation accrues legal interest from the date on which the damage occurred.

145.    Messrs. Beighton, Middleton, and Power—the Hong Kong JPLs—were previously selected by HSBC to serve as independent financial advisors for the Club Lenders. Prior to their appointment by the Hong Kong Court, these individuals purported to represent all CF Group lenders.  However, during that time period, unbeknownst to the other Club Lenders, they were preparing to be installed as provisional liquidators at HSBC's behest and without the support of the other Club Lenders.

146.    The Hong Kong JPLs were the surrogates of, and controlled by HSBC.  HSBC used its hand-picked Hong Kong JPLs (with whom it shared legal counsel) to attempt to take control of CFG Peru and the Peruvian OpCos and to exercise control over the Peruvian Business. HSBC also agreed to indemnify the Hong Kong JPLs in connection with their appointment. Once appointed, the Hong Kong JPLs also insisted on meeting with the creditors and prospective buyers of the Peruvian assets.  And within six weeks of their appointment, the Hong Kong JPLs had already been in contact with twenty-one potential buyers for the Peruvian Business in an effort to sell them as quickly as possible for the benefit of HSBC.

147.    The Hong Kong JPLs caused significant harm to CFG Peru's equity interest in the Peruvian OpCos and to those companies themselves by, among other things, causing the Peruvian OpCos to lose access to liquidity needed to operate their businesses from banks that provide working capital and warehouse companies and other forms of inventory financing and impaired fishing operations.

148.    Before the appointment of the JPLs, indications of interest totaled as much as $1.7 billion.  After the appointment, only one indication of interest came close to that amount ($1.5 billion, but that bidding party refused to take the necessary steps to proceed to the next round of the sale process), resulting in at least a $200 million decline in the bids.  The remaining non-binding expressions of interest that were received were in much lesser amounts.  HSBC expected to receive a "price starting with a 9."[85]

149.    After HSBC had the JPLs installed, the JPLs caused damage to CFG Peru and the Peruvian OpCos.  Under Peruvian law, HSBC is liable for the full amount of damage caused by the JPLs.

## THIRD COUNT
### Breach of Duty Causing Loss Under Hong Kong Common Law

150.    The Trustee repeats and realleges the allegations in paragraphs 1 through 149 above, as if fully set forth herein.

151.    Under Hong Kong law, a lender exercising its power of sale over security owes the borrower a duty of care to obtain the true market value of the asset.  After deducting for the amount owed to the lender, the proceeds of sale belong to the borrower.  The borrower therefore is vitally affected by the results from the sale of its assets by the lender.

152.    Under these circumstances, the lender owes the borrower a duty of care to achieve true market value in the sale and a duty of good faith to act honestly and without reckless disregard for the borrower's interests.

153.    Under Hong Kong Law, a creditor filing an application for the appointment of liquidators assumes the duty to act in good faith (the corollary being the duty to not act in bad faith) and the duty to take reasonable care to not cause damage to the borrower's assets, whether

---

[85]     HSBCHK-TR-00018131.

itself or through its agent(s).  These duties are ongoing in nature, and apply even after the appointment of liquidators.

154.    CFG Peru, as the owner of the Peruvian Opcos, is vitally affected by the result of any sale of the Peruvian Business.  The proceeds of any sale, after deducting for the amount owed to the Club Lenders, will accrue to the account of CFG Peru, as owner of the Peruvian Opcos.  As a creditor of CFGL, CFIL, and Smart Group, CFG Peru also is vitally affected by the result of any sale of the Peruvian Business.  The proceeds of any such sale may accrue to their account.

155.    Upon filing the application for the appointment of the Hong Kong JPLs, and in getting the JPLs appointed and taking control of the sale process for the Peruvian Businesses through the HSBC Undertaking, HSBC assumed a duty of care and of good faith.

156.    HSBC breached both of these duties by, among other things, acting in reckless disregard for the interests of CFIL, CFGL, and CFG Peru; focusing myopically on the payment of its own debt to the detriment of other creditors; creating an environment that chilled bidding, imposing truncated deadlines in the Deed of Undertaking; ignoring the Club Lenders' concerns; and breaching its duty of full and frank disclosure by, among other things, relying on the one-year old FTI Report, failing to disclose Deloitte's opinion that the Peruvian operations were well-run, failing to apprise the Hong Kong Court of the status of the sale process, and proceeding with the ex parte application despite knowing that the appointment of JPLs would depress the value of the Peruvian Business.

157.    HSBC's actions materially and negatively impacted the value of the Peruvian Business and harmed CFG Peru's equity interest in the Peruvian OpCos and harmed entities against whom CFG Peru has asserted claims.

47

158.    Under Hong Kong law, parties filing an <u>ex parte</u> petition for the appointment of provisional liquidators have a duty to fully and frankly disclose all material facts to the deciding court.

159.    HSBC failed to satisfy its obligation, when making an <u>ex parte</u> application to (i) make proper enquiries before bringing the application; and (ii) bring to the court's attention all facts material to the determination of the party's right to that injunction as well as any points that could have been made by the defendant.  Nor did HSBC provide any undertaking with respect to damages in connection with the JPL Application, as is ordinarily provided on <u>ex parte</u> applications.  Such an undertaking may have caused HSBC to act with greater restraint.

160.    HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its <u>ex parte</u> application that it either knew or should have known.

161.    HSBC had a duty to inform the Hong Kong Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose.  HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.

162.    There was no need to appoint liquidators because there was no risk of dissipation of assets, a fact that HSBC understood and that was corroborated by the lack of support among the other Club Lenders for those proceedings, their concern that the appointment of liquidators not only damaged operations but also damaged the companies' value and obstructed the sale process, and their suspicion that HSBC did nothing with the FTI Report for more than a year while HSBC secured repayment of its bilateral facilities.  That suspicion was well founded,

considering that HSBC agreed with Pacific Andes Group management to keep from the other

Club Lenders the fact that the Pacific Andes loans were being managed in HSBC's risk area.

And, HSBC knew its evidence was flimsy.  HSBC expected the JPLs would be discharged after

the four-day evidentiary hearing.

163.    Largely on the basis of the Hong Kong Court's decision, the Cayman Court also

appointed provisional liquidators.

164.    The Peruvian Opcos are the cornerstone of the Trustee's restructuring efforts in

the United States.

165.    The extent to which there was no need to appoint the liquidators to preserve assets

is underscored by the lack of support among the other Club Lenders for those proceedings and

their concern that the appointment of liquidators not only damaged operations but also damaged

the companies' value and obstructed the sale process.

166.    Largely on the basis of the Hong Kong Court's decision, the Cayman Court also

appointed provisional liquidators.

167.    The appointment of provisional liquidators significantly harmed CFG Peru, which

owns the Peruvian OpCos, including, among other things, by causing the Peruvian OpCos to lose

access to liquidity needed to operate their businesses and materially impeding fishing operations.

168.    The appointment of the JPLs also caused a substantial decrease in the value of

CFG Peru's equity interest in the Peruvian OpCos by causing the companies' operations to

contract and interfering with a measured and deliberate sale process.

169.    Before the appointment of the JPLs, indications of interest totaled as much as $1.7

billion.  After the appointment, they were much lower—by at least $200 million.  While one

indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed

to the next round of the sale process.  The remaining non-binding expressions of interest that were received were in much lesser amounts.  HSBC expected to receive a "price starting with a 9."[86]

170.    From and after November 25, 2015, HSBC exerted control over the CF Group by having the JPLs appointed, sending them as its surrogates to Peru immediately after their appointment to meet with the Peruvian OpCos' lenders in a manner that disrupted those relationships, obtaining the HSBC Undertaking, and dictating the terms of the sale process for those entities.

171.    HSBC knew the appointment of the JPLs would damage to the value of CFG Peru's equity interest in the Peruvian OpCos.  Yet in order to realize a sale – even at a depressed valuation – HSBC proceeded with the application, breaching its duties to the Hong Kong Court in the process.  It acted with reckless disregard for the interests of CFIL, CFGL and CFG Peru, and breached its duties of care and of good faith.

## FOURTH COUNT
## Unlawful Interference With Business Under Hong Kong Law

172.    The Trustee repeats and realleges the allegations in paragraphs 1 through 171 above, as if fully set forth herein.

173.    Under Hong Kong law, a defendant may be liable for unlawful interference with business where it uses unlawful means to interfere with the actions of a third party in relation to the plaintiff, intending to cause harm.

174.    HSBC used unlawful means to have the JPLs appointed as reflected by HSBC's failure to discharge its duty of full and frank disclosure on the ex parte application; HSBC's breach of its duties of care and good faith under Hong Kong law; HSBC's failure to give the type

---

[86]    HSBCHK-TR-00018131.

of undertaking for damages that is ordinarily provided on ex parte applications; and HSBC's breach of obligations under Peruvian and U.S. law.

175.    The appointment of the JPLs clearly interfered with the actions of third parties in relation to CFG Peru. Among other things, the appointment chilled bidding in the sale process, created a market perception that the Peruvian Business could be acquired for a lower price, and otherwise scuttled a deliberate and measured sale process, the details of which HSBC was aware.

176.    HSBC's interference was unlawful. Among other things, HSBC breached its duty of candor with the Hong Kong Court and failed to inform it of material facts that it knew or should have known would be relevant. HSBC misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court, resulting in the appointment of the Hong Kong JPLs here.

177.    HSBC intended to cause loss. Having obtained repayment on its bilateral facilities, HSBC no longer had an interest in a value-maximizing sale process. Instead, HSBC was content to have the JPLs consummate an expedited liquidation of the Peruvian Business even though that liquidation would yield significantly less than would be realized through a measured, deliberate sale process. The appointment of the JPLs at HSBC's request caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank. As a result of HSBC's interference with the prospective business relationships with BCP, BBVA, Scotia Bank and other lenders and inventory financiers as well as prospective purchasers of the Peruvian Business, CFG Peru suffered actual damage, including a diminution in the value of its equity interests in the Peruvian OpCos.

## FIFTH COUNT
### Tortious Interference with Business Relationship (U.S. Law)

178.   The Trustee repeats and realleges the allegations in paragraphs 1 through 177 above, as if fully set forth herein.

179.   Prior to the JPL Application, BCP provided inventory financing to the Peruvian OpCos of up to $100 million plus an additional $15 million in short-term working capital.  The Peruvian OpCos also received local financing from BBVA and Scotia Bank.  This financing was essential to fund operations of the Peruvian OpCos, including payments to suppliers and employees.

180.   HSBC knew that the Peruvian OpCos required financing to fund their operations and that the Peruvian OpCos had relationships with the local banks and warehouse inventory financiers that provided that financing.

181.   On November 25, 2015, HSBC filed the JPL Application seeking, among other things, the appointment of provisional liquidators over CFGL and CFIL and thereby intentionally interfered with those relationships.  HSBC's conduct was intentional because HSBC knew that interference with the Peruvian OpCos' relationship with their lenders was certain or substantially certain to occur as a result of its actions.

182.   The appointment of the JPLs caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank.  BCP suspended its $100 million facility with the Peruvian OpCos because of the appointment of the JPLs.  BBVA and Scotia Bank similarly suspended their facilities with the Peruvian OpCos.

183.   The interference was improper because HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte application that it knew or should have known.  HSBC had a duty to inform the Hong Kong

52

Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose. HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.

184.    CFG Peru suffered actual losses as a result of HSBC's interference with the relationships with BCP, BBVA, Scotia Bank and other lenders or inventory financiers.

## SIXTH COUNT
### Tortious Interference with Prospective Economic Advantage (U.S. Law)

185.    The Trustee repeats and realleges the allegations in paragraphs 1 through 184 above, as if fully set forth herein.

186.    Prior to the JPL Application, BCP provided inventory financing to the Peruvian OpCos of up to $100 million plus an additional $15 million in short-term working capital. The Peruvian OpCos also received local financing from BBVA and Scotia Bank. This financing was essential to fund operations of the Peruvian OpCos, including payments to suppliers and employees.

187.    The appointment of the JPLs caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank. BCP suspended its $100 million facility with the Peruvian OpCos because of the appointment of the JPLs. BBVA and Scotia Bank similarly suspended their facilities with the Peruvian OpCos.

188.    CFG Peru suffered actual losses as a result of HSBC's interference with the prospective business relationships with BCP, BBVA, Scotia Bank and other lenders or inventory financiers.

189.    Prior to the JPL Application, Pacific Andes Group management was contemplating a measured and deliberate process for the sale of the Peruvian Business.

53

190.    In November 2015, two investors interested in acquiring the CF Group for as much as $1.7 billion were in discussions with the Pacific Andes Group.  A memorandum of understanding was expected to be signed on November 26, 2015.  On November 25, 2015, HSBC filed the JPL Application seeking, among other things, the appointment of provisional liquidators over CFGL and CFIL, and intentionally interfered with those prospective relationships.  At the time it commenced the liquidation proceedings, HSBC was aware of the details of the sale process, including the categories and number of potential bidders, the range of the potential bids, and the upcoming deadlines.  HSBC knew that interference with the prospective relationships with those potential purchases was certain or substantially certain to occur as a result of its actions.

191.    HSBC used unfair and improper means to interfere with these prospective relationships.  HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte application that it knew or should have known.  HSBC had a duty to inform the Hong Kong Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose.  HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.

192.    The JPL Application not only interfered with the prospective relationships with the two investors, but it also changed the environment in which the sale was being conducted and invited lower bids.  For example, a potential purchaser indicated it would be willing to offer around $1.6 billion for the Peruvian OpCos but would not be willing to offer a similar sum if the sale process was run by the JPLs.  Further, the compressed timeframe imposed by HSBC in the

HSBC Undertaking chilled bidding.

193.    CFG Peru suffered actual losses as a result of HSBC's interference with the prospective business relationships with potential purchasers of some or all of the Peruvian Business.

## SEVENTH COUNT
**Equitable Subordination or Disallowance of Claims Under 11 U.S.C. §§ 105(a), 502(a), and 510(c)**

194.    The Trustee repeats and realleges the allegations in paragraphs 1 through 194 above, as if fully set forth herein.

195.    The Court appointed the Trustee with respect to CFG Peru, noting, among other things, that "[i]t makes little practical or economic sense to appoint a trustee for each Debtor;" that "it is uncertain what impact such an appointment would have on (i) the Debtors' other businesses and affiliates (including non-debtor operating subsidiaries) and their creditors and constituents, and (ii) the corporate governance of the affected Debtor and non-Debtor entities in foreign jurisdictions (including publicly traded companies);" and that the Trustee's appointment at CFG Peru "presents limited corporate governance and recognition issues."

196.    CFG Peru is a creditor and party in interest in the chapter 11 cases of CFGL, CFIL, and Smart Group and therefore entitled pursuant to section 502(a) to object to filed proofs of claim.

197.    HSBC has filed proofs of claim in the chapter 11 cases of CFGL (No. 98-1, 105-1), N.S. Hong (62-1, 86-1), CFIL (No. 40-1), and Smart Group (No. 76-1, 77-1) in an amount "no less than $104,826,809.47" (collectively, the "HSBC Proofs Of Claim").

198.    CFG Peru has filed proofs of claim against other debtor entities that are located above CFGL in the capital structure.  Those claims will benefit to the extent the claims of HSBC are equitably subordinated or disallowed at CFIL, CFGL, or Smart Group.

199.    HSBC was an insider of the Debtors, either as a "person in control of the debtor" pursuant to 11 U.S.C. § 101(31)(B), or as a non-statutory insider.

200.    HSBC engaged in and benefited from inequitable conduct that resulted in injury to the creditors and parties in interest in the chapter 11 cases of CFGL, CFIL, and Smart Group, including CFG Peru, and conferred an unfair advantage to HSBC.  This inequitable conduct resulted in harm to CFG Peru and the creditor body in those Chapter 11 Cases because creditors are less likely to recover the full amounts due to them.

201.    HSBC's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed CFG Peru and the creditors and stakeholders in the Debtors' chapter 11 cases.

202.    CFG Peru suffered injury that was particular to CFG Peru and not suffered by other creditors because, inter alia, CFG Peru is the 100% equity holder of the Peruvian OpCos; the Peruvian OpCos sustained direct damages to their operations as a result of HSBC's conduct; and the value of the Peruvian OpCos as assets being sold through a measured and deliberate sale process was directly impacted by HSBC's conduct.

203.    HSBC benefited from its conduct by using the Hong Kong JPLs to wrestle control of CFG Peru and the Peruvian Business, which is the crown jewel of the Pacific Andes companies.  Once appointed, the Hong Kong JPLs insisted on meeting with the creditors and prospective buyers of the Peruvian OpCos.  And, within six weeks of their appointment, the Hong Kong JPLs had already been in contact with twenty-one potential buyers for the Peruvian Business in an effort to sell them as quickly as possible for the benefit of HSBC.

204.    The Hong Kong JPLs caused significant harm to CFG Peru's equity interest in the Peruvian OpCos and to those companies themselves by, among other things, causing the

Peruvian OpCos to lose access to liquidity needed to operate their businesses from banks that provide working capital and warehouse companies and other forms of inventory financing and impaired fishing operations.

205.    The Peruvian OpCos are the cornerstone of the Trustee's restructuring efforts in the United States, and his mandate is to maximize their value.  As a result of the appointment of the JPLs and HSBC's collection efforts thereafter, including the HSBC Undertaking, the Peruvian OpCos and CFG Peru suffered damages resulting from lost revenue and profit, increased financing costs, and lost capacity.  The appointment of the JPLs also caused a substantial decrease in the value of CFG Peru's equity interest in the Peruvian OpCos because it caused the companies' operations to contract and interfered with a process for a measured and deliberate sale of those companies.

206.    Before the appointment of the JPLs, indications of interest totaled as much as $1.7 billion.  After the appointment, they were much lower—by at least $200 million.  While one indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed to the next round of the sale process.  The remaining non-binding expressions of interest that were received were in much lesser amounts.  HSBC expected to receive a "price starting with a 9."[87]

207.    In equity and good conscience, any claim or interest of HSBC asserted against the Debtors' estates, including those asserted in the HSBC Proofs Of Claim, should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and/or disallowed to the fullest extent permitted by law.

---

[87]    HSBCHK-TR-00018131.

208.    Equitable subordination or disallowance, as requested herein, is consistent with

the provisions and purposes of the Bankruptcy Code.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of the Trustee

and against the Defendant as follows:

A.   on the First Count, under Peruvian Civil Code Articles 1969 and 1985, entering judgment for the Trustee and against HSBC for damages caused by HSBC's malice and/or negligence;

B.   on the Second Count, under Peruvian Civil Code Articles 1981 and 1985, entering judgment for the Trustee and against HSBC for damages caused by the Hong Kong JPLs at the direction of HSBC;

C.   on the Third Count, under Hong Kong common law, entering judgment for the Trustee and against HSBC for damages caused by HSBC's breach of duties;

D.   on the Fourth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's unlawful interference with business under Hong Kong law;

E.   on the Fifth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's tortious interference with business relationships under U.S. law;

F.   on the Sixth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's tortious interference with prospective economic advantage under U.S. law;

G.   on the Seventh Count, under sections 105(a), 502(a), and 510(c) of the Bankruptcy Code, subordinating and/or disallowing the HSBC Proofs Of Claim for purposes of distribution to all allowed claims and equity interests of Debtors CFGL, N.S. Hong, CFIL, and Smart Group, such that no claim of HSBC is paid ahead of the allowed claim of any customer, creditor, or shareholder of Debtors CFGL, N.S. Hong, CFIL, or Smart Group, including CFG Peru;

H.   awarding damages with respect to the First through Seventh Counts, including (a) damages resulting from lost revenue and profit, increased financing costs, lost capacity, and the inability of the Peruvian OpCos to realize the quota allocated to them by the Peruvian government—in an amount to be proven at trial, but not less than $45 million and (b) damages to the value of the Peruvian Business and CFG Peru's equity interests caused by HSBC's interference with its operations and interference with the sale (as reflected by, among other things, the difference between bids received before and after the appointment of the JPLs)—in an amount to be proven at trial, but not less than $200 million;

59

I.      the Trustee attorneys' fees and all applicable interest, costs, and disbursements of
        this proceeding; and

J.      granting the Trustee such other, further, and different relief as the Court deems
        just, proper, and equitable.

DATED:   New York, New York
         March 7, 2019

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  /s/ JAMES C. TECCE
     James C. Tecce
     Julia M. Beskin
     Kate Scherling
     Jordan Harap

     51 Madison Avenue, 22nd Floor
     New York, New York 10010
     Telephone:  (212) 849-7000

*Counsel for William A. Brandt, Jr., Chapter
11 Trustee for CFG Peru Investments Pte. Ltd.
(Singapore)*

## EXHIBIT A

James C. Tecce Julia M. Beskin Kate Scherling Jordan Harap
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Counsel for William A. Brandt, Jr., as Trustee of CFG Peru Investments Pte. Ltd. (Singapore)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Case No. 16-11895 (JLG) |
| | : | |
| CHINA FISHERY GROUP LIMITED | : : | Chapter 11 (Jointly Administered) |
| (CAYMAN), <u>et al.</u>, | | |
| | : | |
| Debtors. | : | |

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Case No. 16-11914 (JLG) |
| | : | |
| CFG PERU INVESTMENTS PTE. LTD. | : : | Chapter 11 |
| (SINGAPORE), | | |
| | : | |
| Debtor. | : | |

---------------------------------------------------------- x

| | | |
|---|---|---|
| WILLIAM A. BRANDT, JR., AS TRUSTEE OF | : : : | Adv. Pro. No.  18-01575 (JLG) |
| CFG PERU INVESTMENTS PTE. LTD. | | |
| (SINGAPORE), | | |
| Plaintiff, | : : | **FIRST AMENDED COMPLAINT** |
| | : | |
| v. | : | |
| | : | |
| THE HONGKONG AND SHANGHAI | : : | |
| BANKING CORPORATION LIMITED, | | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------- x

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   JURISDICTION & PARTIES ...........................................4JURISDICTION & PARTIES 5

III.  FACTUAL ALLEGATIONS ..............................................5FACTUAL ALLEGATIONS 6

    A.    CF GROUP .........................................................................5CF GROUP 6

    B.    PERUVIAN BUSINESS AND FINANCING OF FISHMEAL OPERATIONS .........7PERUVIAN BUSINESS AND FINANCING OF FISHMEAL OPERATIONS ...........................................8

    C.    APRIL 2014 THROUGH NOVEMBER 2015: CLUB LENDERS PROVIDE EXTENSIONS AND INITIATE MEASURED SALE PROCESS.9EXTENSIONS AND INITIATE MEASURED SALE PROCESS .............................................................11

        1.    EXTENSIONS AND WAIVERS RELATING TO CLUB FACILITY .....9EXTENSIONS AND WAIVERS RELATING TO CLUB FACILITY .............................................11

        2.    HSBC DEMANDS REPAYMENT.............11HSBC DEMANDS REPAYMENT OF BILATERAL FACILITIES ...........................................................12

        3.    NOVEMBER 10, 2015: EIGHTH AMENDMENT11NOVEMBER 10, 2015: EIGHTH AMENDMENT ....................................................................14

    D.    NOVEMBER 25, 2015: HSBC INITIATES EX PARTE LIQUIDATION PROCEEDINGS ...........................................12PROCEEDINGS 15

    E.    CLUB LENDERS DID NOT SUPPORT LIQUIDATION PROCEEDINGS... 18CLUB LENDERS DID NOT SUPPORT LIQUIDATION PROCEEDINGS ............................................23

    F.    LIQUIDATION PROCEEDINGS HARM PERUVIAN OPERATIONS ............ 20LIQUIDATION PROCEEDINGS HARM PERUVIAN OPERATIONS ............................................26

    G.    HONG KONG COURT DISMISSES HSBC'S JPLS; HSBC SECURES UNDERTAKING .....................................................22UNDERTAKING ...................................................................................28

    H.    STIGMA OF LIQUIDATION PROCEEDING LINGERS AFTER JPLS ARE DISMISSED .................................................24DISMISSED ......................................................................................31

    I.    HSBC INTERFERES WITH SALE PROCESS25HSBC INTERFERES WITH SALE PROCESS 32

    J.    CHAPTER 11 CASES COMMENCED IN NEW YORK30CHAPTER 11 CASES COMMENCED IN NEW YORK ...........................................................37FIRST COUNT 31SECOND COUNT ..............................................33THIRD COUNT 34FOURTH COUNT ..............................................38FIFTH COUNT 39SIXTH COUNT ................................................41PRAYER FOR RELIEF 43

    K.    HSBC WAS AN INSIDER OF PACIFIC ANDES COMPANIES ...................................40

FIRST COUNT ........................................................................................................42

SECOND COUNT ..................................................................................................44

THIRD COUNT ......................................................................................................46

FOURTH COUNT ...................................................................................................50

FIFTH COUNT .......................................................................................................52

SIXTH COUNT .......................................................................................................53

SEVENTH COUNT .................................................................................................55

PRAYER FOR RELIEF ..........................................................................................59

Plaintiff William A. Brandt, Jr., as chapter 11 trustee (the "<u>Trustee</u>") for CFG Peru

Investments Pte. Ltd. (Singapore) ("<u>CFG Peru</u>"), a Debtor[1] in these Chapter 11 Cases, through

his undersigned counsel, brings this action and alleges as follows:[2]

## I.    ~~PRELIMINARY STATEMENT~~[2][3]

1.    The Trustee brings this action seeking redress for the damage caused by a creditor

whose conduct exceeded the boundaries of commercial reasonableness, damaged CFG Peru's

equity interest in the Peruvian OpCos—the sale of which is the cornerstone of the U.S.

restructuring effort—and diminished recovery prospects for the CF Group's (and Pacific Andes

Group's) creditors, including CFG Peru. While courts traditionally afford lenders latitude when

pursuing the repayment of their debts, there are limitations. This case will be cited for enforcing

those limits in the face of unbridled overreach.

2.    In November 2015, the Club Lenders had agreed to the eighth amendment to their

$650 million loan and were working cooperatively with the Debtors to pursue a measured sale of

the Peruvian Business. On November 25, 2015, <u>after forcing the Pacific Andes Group to repay</u>

<u>more than $100 million in outstanding bilateral credit facilities,</u> HSBC abruptly broke ranks with

---

[1]    The debtors in these chapter 11 cases are: China Fishery Group Limited (Cayman) ("<u>CFGL</u>"), Pacific Andes International Holdings Limited (Bermuda) ("<u>PAIH</u>"), N.S. Hong Investment (BVI) Limited ("<u>N.S. Hong</u>"), South Pacific Shipping Agency Limited (BVI) ("<u>SPSA</u>"), China Fisheries International Limited (Samoa) ("<u>CFIL</u>", CFGL (Singapore) Private Limited ("<u>CFGLPL</u>"), Chanery Investment Inc. (BVI)
("<u>Chanery</u>"), Champion Maritime Limited (BVI) ("<u>Champion</u>"), Growing Management Limited (BVI) ("<u>Growing Management</u>"), Target Shipping Limited (HK) ("<u>Target Shipping</u>"), Fortress Agents Limited (BVI) ("<u>Fortress</u>"), Ocean Expert International Limited (BVI) ("<u>Ocean Expert</u>"), Protein Trading Limited (Samoa) ("<u>Protein Trading</u>"), CFG Peru Investments Pte. Limited (Singapore) ("<u>CFG Peru</u>"), Smart Group Limited (Cayman) ("<u>Smart Group</u>"), Super Investment Limited (Cayman) ("<u>Super Investment</u>"), Pacific Andes Resources Development Limited (Bermuda), Nouvelle Foods International Ltd., Golden Target Pacific Limited, Pacific Andes International Holdings (BVI) Limited, Zhonggang Fisheries Limited, Admired Agents Limited, Chiksano Management Limited, Clamford Holding Limited, Excel Concept Limited, Gain Star Management Limited, Grand Success Investment (Singapore) Private Limited, Hill Cosmos International Limited, Loyal Mark Holdings Limited, Metro Island International Limited, Mission Excel International Limited, Natprop Investments Limited, Pioneer Logistics Limited, Sea Capital International Limited, Shine Bright Management Limited, Superb Choice International Limited, and Toyama Holdings Limited (BVI) (collectively, the "<u>Debtors</u>").

[2]    A redline of the First Amended Complaint against the Complaint is attached hereto as **Exhibit A.**

[2][3]    **Capitalized terms not defined in the Preliminary Statement are defined herein.**

the other Club Lenders under the multilateral Club Facility and petitioned a Hong Kong court on

an ex parte basis to appoint provisional liquidators with respect to CFGL and CFIL. Shortly

thereafter, HSBC also petitioned for the appointment of joint provisional liquidators in the

Cayman Islands.

3.      The timing of HSBC's pursuit of such an extraordinary remedy could not have

been worse. The Peruvian Business was rebounding from the effects of El Niño, the second fishing

season for 2015 was about to commence, and the Peruvian Business was at the typical low-point of

its cash position for the year and could not operate without the assistance of Peruvian banks. After

the Hong Kong JPLs were appointed at HSBC's request and dispatched to Peru to wrestle control

of the Peruvian Business, local banks refused to provide financing, restricting operations and

impeding the Peruvian Business' ability to realize the quota allotted to it by the Peruvian

government.

4.      The JPLs' appointment also damaged the prospects for a value-maximizing sale for

the Peruvian Business. In November 2015, fifteen industrial or financial parties had expressed

interest, and two investors interested in acquiring the CF Group for as much as $1.7 billion were in

discussions with the Pacific Andes Group. A memorandum of understanding was expected to be

signed on November 26, 2015. HSBC commenced the proceedings the day before, on November

25, 2015, and scuttled those negotiations. HSBC capriciously commenced the liquidation

proceedings even though, at that time, HSBC understood the status of the sale process, including

the number of potential bidders, the range of potential bids, and the upcoming deadlines. HSBC

understood that its actions would depress values that could be obtained in the sale.

5.      The recklessness of HSBC's conduct was confirmed six weeks later on January 5,

2016, when the Hong Kong Court reversed its order appointing the Hong Kong JPLs and

terminated their appointment. Among other things, HSBC's ex parte application relied on a

selective presentment of facts, specifically a report prepared by FTI Consulting Hong Kong ("FTI")

a year earlier. After a trial where additional facts were supplied to the court by other

parties, including the Club Lenders, it became clear that the JPLs' appointment was neither

warranted nor necessary (let alone urgent), and the Hong Kong Court dismissed the liquidators.[34]

6.      However, the damage HSBC caused could not be remedied. In Peru, management

worked tirelessly to restore creditor and vendor confidence after the dismissal, but the specter of

the JPLs' appointment lingered. Relationships with critical working capital providers, trade

vendors, inventory financing sources, and customers were incurably infected by sustained

concern about the implications of a liquidation proceeding.

7.      HSBC understood the leverage that threatening liquidation proceedings gave it

over the CF Group and wielded that threat to exercise control. While HSBC agreed to suspend

the liquidation proceedings, it only did so after extracting a tentious Deed of Undertaking in

January 2016. HSBC dropped its appeal from the Hong Kong Court decision dismissing the JPLs

and withdrew the Cayman JPLs' appointment on the condition that the company accede to a

truncated sale deadline of July 15, 2016 and the appointment of Paul Brough as Chief

Restructuring Officer. Critically, HSBC reserved the right to reappoint the Cayman JPLs if the

company did not comply with the sale deadline.

---

[34]      See Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern District Of
New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶¶ 114-18; see also August 23,
2016 Ng Declaration (Dkt. 105) at ¶¶ 64, 79-79; In re China Fisheries Int'l Ltd., HCMP 134/2018 [2019] H.K.C.F.I. 174
at 10:F-H.

8.      The HSBC Undertaking quickly proved to be value-depletive. The short fuse

HSBC attached to the sale process, coupled with the change in market sentiment brought about by

the commencement of liquidation proceedings and the liquidators' appointment, interfered with

the ongoing sale process. Had the indications of interest totaling approximately $1.7 billion

immediately prior to the Hong Kong JPLs' appointment on November 25, 2015 ripened into

binding agreements, the resulting sale would have provided for substantial recoveries to the

creditors of the CF Group and the Pacific Andes Group. Instead, the accelerated sale process

instituted and enforced by HSBC resulted in substantially lower bids that ascribed significantly

less value to the Peruvian Business than would have been realized absent HSBC's interference.

HSBC bears responsibility for the harm and value depletion its interference caused.

9.      Regardless of which law applies—Peruvian law, Hong Kong law, or U.S. law—

HSBC's conduct gives rise to common law claims for negligence, breach of duty, and tortious

interference. HSBC is liable for damages caused to CFG Peru in both CFG Peru's capacity as the

owner of the equity in the Peruvian OpCos and as a creditor of CFGL, ~~N.S. Hong,~~ CFIL, and

Smart Group, including (a) damages resulting from the Peruvian Business' lost revenue and

profit, increased financing costs, lost capacity, and inability to realize the quota allocated to it by

the Peruvian government—in an amount to be proven at trial, but not less than $45 million; and~~(b)~~

(b) damages to the value of the Peruvian Business caused by HSBC's interference with both its

operations and a measured and deliberate process for a sale (as reflected by, among other things,

the differences between bids received before and after the appointment of the JPLs)—in an

amount to be proven at trial, but not less than $200 million. Finally, HSBC's claims against the

estates totaling more than $100 million should be equitably subordinated or disallowed given the

extent to which HSBC exceeded the confines of permissible conduct and the damage it caused.

Equity dictates that HSBC forfeited any entitlement to a recovery from the estates.

## II.    JURISDICTION & PARTIES

10.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

11.    On June 30, 2016 (the "Petition Date"), the Debtors, including CFG Peru, filed voluntary petitions with the United States Bankruptcy Court for the Southern District of New York (the "Court") for relief under chapter 11 of the Bankruptcy Code. On July 14, 2016, the Court entered an order consolidating the chapter 11 cases (together, the "Chapter 11 Cases") (Dkt. 27). The Chapter 11 Cases remain pending.

12.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).

13.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C), and (O).

14.    ~~11.~~The Trustee consents to the entry of a final Order by this Court with respect to all counts in this Complaint.

15.    ~~12.~~Plaintiff is William A. Brandt, Jr., in his capacity as Trustee for CFG Peru. The Trustee's appointment was confirmed by an Order dated November 10, 2016 (Dkt. 219).

16.    ~~13.~~CFG Peru is the direct or indirect owner of 100% of the equity of the Peruvian OpCos and SFR (as those terms are defined herein).

17.    ~~14.~~Defendant is The Hongkong and Shanghai Banking Corporation Limited ("HSBC"), a banking entity incorporated and headquartered in the Hong Kong Special Administrative Region of the People's Republic of China ("Hong Kong").

18.    This Court can exercise personal jurisdiction over HSBC because, among other

things, HSBC (a) has filed proofs of claim in the chapter 11 cases of CFGL (Case No. 16-

11895), CFIL (Case No. 16-11896), N.S. Hong (Case No. 16-11899), and Smart Group (Case

No. 16-11910) seeking in excess of $100 million (the "Proofs of Claim"); (b) entered notices of

appearance in each of those cases and the chapter 11 case of CFG Peru (No. 16-11914); (c)

requested affirmative relief from this Court, including sustaining its objection to the retention of

the Trustee's conflicts counsel, Quinn Emanuel Urquhart & Sullivan LLP. In its decision

granting the Trustee's motion for approval to propound discovery pursuant to Rule 2004 of the

Federal Rules of Bankruptcy Procedure, this Court concluded that HSBC had submitted to its

jurisdiction by filing the Proofs of Claim.[5] In denying HSBC's motion for leave to appeal the

Rule 2004 Decision, the United States District Court for the Southern District of New York

confirmed that proposition.[6] The United States Court of Appeals for the Second Circuit rejected

both HSBC's appeal from the District Court's decision and HSBC's subsequent petition for

rehearing en banc.[7]

### III.    FACTUAL ALLEGATIONS

#### A.    CF GROUP

19.    ~~15.~~The Pacific Andes group of companies is the twelfth largest seafood company in

the world. N.S. Hong is the ultimate and indirect owner of all the Debtors, including Pacific Andes

International Holdings Limited ("PAIH") (together, N.S. Hong and PAIH with their direct

and indirect subsidiaries, are hereinafter referred to as the "Pacific Andes Group").

~~16.~~

20.    In 2004, indirect subsidiaries of PAIH bought an interest in the China Fishery

---

[5]    See In re China Fishery Grp. Ltd., No. 16-11895 (JLG), 2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) (Memorandum Decision and Order Granting Trustee's Motion To Authorize Issuance of Subpoenas to Hongkong Shanghai Banking Corporation Limited (the "Rule 2004 Decision")).

[6]    See Hongkong & Shanghai Banking Corp. Ltd. v. Brandt for CFG Peru Investments Pte. Ltd. (Singapore), 2017 WL 6729191, at *5-6 (S.D.N.Y. Dec. 29, 2017) (denying leave to appeal Rule 2004 Decision and noting, among other things, that "it is clear that filing a proof of claim generates personal jurisdiction over a creditor, a position as to which there is no substantial ground for a difference of opinion").

[7]    HSBC v. Brandt (In re China Fishery Ltd. (Cayman), No. 18-5 (2d Cir.) Dkt. No. 41 (Order dated May 21, 2018

Group (the "CF Group"), which is a group of companies owned by China Fishery Group Limited ("CFGL"), a public company incorporated under the laws of the Cayman Islands.

21.    ~~17.~~In 2013, the CF Group acquired Corporacion Pesquera Inca S.A.C. ("Copeinca") for an acquisition cost of approximately $1.04 billion. In 2013, Copeinca held a 10.7% quota for Peru's anchovy harvest. CF Group operates as part of the Pacific Andes Group:



Figure 1. The Pacific Andes Group.

22.    ~~18.~~Thirteen of the sixteen Debtors[48]in these Chapter 11 Cases are members of the CF Group. CFG Investments S.A.C. ("CFGI"), Copeinca, and Sustainable Fishing Resources S.A.C.

---

dismissing appeal); Dkt. No. 45 (Order dated July 3, 2018 denying motion for reconsideration en banc).
[48]    The thirteen Debtors are: CFGL; Smart Group; Protein Trading; SPSA; CFG Peru; CFIL; Growing Management; Chanery; Champion; Target Shipping; Fortress; CFGLPL; and Ocean Expert.

("SFR"), which are not Debtors in these Chapter 11 Cases, are also part of the CF Group.

23.    19.The main operating entities of the CF Group are CFGI and Copeinca and (together, the "Peruvian OpCos"), which produce and sell fishmeal. SFR is the Peruvian OpCos' sister company in the open water fleet business. SFR's main assets are the *Damanzaihao*, considered to be the world's largest fish factory vessel, and five smaller "catcher" vessels.

24.    20.CFG Peru owns 100% of the equity of CFGI, which indirectly owns 100% of the equity of Copeinca. Figure 2 shows the ownership structure of certain relevant entities in the CF Group.



Figure 2. Ownership Structure of Certain Entities in the CF Group.

### B.    PERUVIAN BUSINESS AND FINANCING OF FISHMEAL OPERATIONS

25.    21.The CF Group, primarily through CFGI and Copeinca, sources, harvests, on- board-processes, and delivers high-quality fish products to consumers around the world and engages in fishing, fishmeal and fish oil processing and production in Peru for worldwide

distribution (the "Peruvian Business").

26.   22.Anchovy fishing is heavily regulated by the Peruvian government. The

Peruvian system divides anchovy stock into two zones: (i) the northern and central region and (ii)

the southern region.

27.   23.The Peruvian OpCos harvest Peruvian anchovy in both regions. Each region

has its own two seasons which are determined by the Ministry of Production. The northern and

central region's two yearly fishing seasons generally run from April to July and November to

December and produce the majority of anchovy. The southern region's two fishing seasons are

contiguous, usually from January to July and from August to December, meaning that the

southern region can be fished year round.

28.   24.The Peruvian OpCos' anchovy fishery operations are carried out under Peru's

Individual Transferable Quota system, which was introduced in Peru in April 2009. Under this

system, the Peruvian government establishes a Total Allowable Catch ("TAC") for each fishing

season in the northern-central and southern zones. Each individual fishing vessel is then allocated

a fixed percentage of the TAC, establishing the vessel's seasonal quota.

29.   25.Through the Peruvian OpCos, the CF Group owns the largest single block

of national quota for the harvest of anchovy in Peru: 16.90% of the TAC for the northern and

central zones, the zones most often referred to in connection with the anchovy industry, and

another 14.77% of the anchovy harvest capability in the southern Peruvian zone.

30.   26.The success and viability of the Peruvian Business is dependent upon its

being able to harvest anchovies up to the quotas fixed by the Peruvian government.[59]

31.   27.Substantially all the anchovy harvested by the CF Group is used as raw material

---

[59]   Memorandum Decision And Order Granting Motion For Appointment Of A Chapter 11 Trustee (Dkt. 203) the
"Trustee Dec.") at 9.

in its fishmeal operations. The Peruvian OpCos produce approximately 280,000 to 300,000 metric tons of fishmeal and a further 40,000 to 50,000 metric tons of fish oil. In the past, these levels of production have generated an annual revenue stream of between $535 million and $585 million, which customarily results in an annual EBITDA figure of between $180 million and $200 million.

32.    28.The Peruvian OpCos currently have ten processing plants strategically located along the Peruvian coastline near where the anchovy are harvested. The Peruvian OpCos' vessels make daily fishing trips during the fishing seasons.

33.    29.The most valuable assets of CFG Peru (through which the CF Group owns the Peruvian OpCos) are (i) the anchovy fishing quotas that have been allotted to CFG Peru's vessels by the Peruvian government; (ii) operative vessels; and (iii) the fishmeal processing plants, including the related plant permits and equipment.

34.    30.Because of the seasonal nature of their business, the Peruvian OpCos fund operations through local working capital and inventory financing. Historically, the Peruvian OpCos' largest lender has been Banco de Credito del Peru ("BCP"), which had provided inventory financing of up to $100 million plus an additional $15 million in short-term working capital. The Peruvian OpCos also received local financing from BBVA Continental ("BBVA") and Scotia Bank.

35.    31.The inventory financing is used to fund operations during harvesting seasons, including for payments to suppliers and employees, and is repaid when the Peruvian OpCos sell their fishmeal and fish oil following the seasons. Short term working capital financing is also used.

C.    APRIL 2014 THROUGH NOVEMBER 2015: CLUB LENDERS PROVIDE EXTENSIONS AND INITIATE MEASURED SALE PROCESS

1.    Extensions And Waivers Relating To Club Facility

36.    32.On March 20, 2014, Debtor CFIL and non-Debtors CFGI and Copeinca (collectively, the "Club Borrowers") entered into a $650 million Facility Agreement (as amended from time to time, the "Club Facility") with HSBC, Coöperatieve Rabobank U.A. ("Rabobank"), Standard Chartered Bank (Hong Kong) Limited ("Standard Chartered"), DBS Bank (Hong Kong) ("DBS"), and China CITIC International Limited ("China CITIC" and together with HSBC, Rabobank, Standard Chartered, and DBS, the "Club Lenders"). Rabobank was the agent under the Club Facility for the Finance Parties (as defined therein) (hereinafter, the "Agent").

37.    33.Funds were made available under the Club Facility, inter alia, to assist with a corporate restructuring of the CF Group's business, pay off existing debt associated with certain acquisitions, and provide revolving credit to pay down other credit facilities.

38.    34.Between April 30, 2014 and November 11, 2015, the Club Lenders and Club Borrowers entered into eight extension and waiver agreements relating to the obligations under the Club Facility Agreement (the "Extension and Waiver Agreements").

39.    35.In September 2015, the Debtors engaged Deloitte & Touche Financial Advisory Services Limited ("Deloitte") to address the Club Lenders' concerns about transparency with

regard to the Debtors' finances and operations and to perform a limited financial analysis of CFGL, PARD, and PAIH.[6][10]On September 25, 2015, Deloitte updated the Club Lenders on, among other things, the financial position of CFGL, PARD and PAIH, cash flow forecasts, a tentative timetable for a restructuring, proposed sales, a site visit to Peru, and a valuation of the fishing quota factories and vessels (at a sum of $1.69 billion).[7][11]

40.    36.Pursuant to the Sixth Extension and Waiver Request, dated September 30, 2015

---

[6][10]        Trustee Dec. at 15.

(the "Sixth Amendment"), the Club Lenders required the Club Borrowers to, among other things, appoint KPMG as independent financial advisors on behalf of the Club Lenders to review and report on the work undertaken by Deloitte.[8 12] HSBC requested that KPMG be selected.

### 2.     HSBC Demands Repayment of Bilateral Facilities

41.     37.In 2014, HSBC instructed FTI to begin examining certain activities of the Debtors without notifying management of the company of the examination.[9 13] What followed was a report given by FTI to HSBC on October 20, 2014 (the "FTI Report"). The FTI Report focused on transactions principally involving Solar Fish and Parkland Group, which are companies within the Pacific Andes Group but are not part of the CF Group.[14] After FTI prepared its report, HSBC did not present it to the Hong Kong Court for more than a year. Instead, for the rest of 2014, HSBC focused on getting the balance of its bilateral facilities with the Pacific Andes Group repaid. Those facilities were structurally subordinated to the Club Facility with respect to the proceeds from the sale of the Peruvian OpCos.

42.     38.In November 2014, HSBC, notwithstanding internal concerns, developed a strategy to have KPMG installed as provisional liquidators. See HSBCHK-TR-00008319 (Nov. HSBC-TR-000090461, 2014 email: "How about preparing for provisional liquidators in case things move fast and the clearance of KPMG for use as provisional liquidators?"); HSBC-TR-00009046 (Nov. 11,39. 2014 email: "banking are concerned with provisional liquidation strategy. We need to be on the same page.").

43.     At the end of 2014, HSBC demanded repayment from the Pacific Andes Group of

---

[7 11]     Trustee Dec. at 15-16.
[8 12]     Trustee Dec. at 16.
[9 13]     Trustee Dec. at 22 & n. 21.[10]     HSBCHK-TR-00008104.
[14]     See HSBCHK-TR-00045328 (June 30, 2014 email exchange involving Mel Blackford discussing "U-turn transactions involving Solar Fish & Parkmond Group"); HSBCHK-TR-00043862 (August 5, 2014 email exchange containing "provisional findings from Mel" concerning myriad purchases from Solar Fish); HSBCHK-TR-00045698

all of its outstanding trade and bilateral revolving credit facilities. Debtors complied, repaying approximately $102,177,000 by December 31, 2014 (the "HSBC Paydown")—leaving only the $96,503,494 in outstanding principal owing to HSBC under the Club Facility.

44.    40.The aggressiveness with which HSBC pursued repayment of its loans distinguished it from other Club Lenders. In January 2015, HSBC's Head of Banking, Hong Kong, Dai Kitamura, acknowledged HSBC had "been the most difficult bank within the core banking group."[15]

"[10]

45.    HSBC kept from the Club Lenders the extent of its collection efforts in 2014 with respect to HSBC's bilateral lending relationships with the Pacific Andes Group. On December 30, 2014, HSBC's Donna Duke met with Ng Joo Sang from the Pacific Andes Group, the day after which the Pacific Andes Group remitted "the sum of US$65 million to your Bank in full settlement of the outstanding amount under the bilateral loan …. three months earlier than we have promised."[16] After receiving the funds, Ms. Duke advised HSBC's Mark T. McKeown that "this result has only come about from me going to a meeting with him yesterday …. he took us seriously yesterday."[17] During that meeting, Ms. Duke was introduced as "the new manager of the relationship." Ms. Duke "asked about the current position of the other banks—are they requesting repayment and are they being repaid[?]," to which Mr. Dennis Chan, the Pacific Andes Group's financial controller, replied that "all banks remain supportive and none are requesting repayment and all trade and revolving facilities remain available." During the meeting, when Mr. Ng recounted to Ms. Duke a conversation he had earlier that year with HSBC's Gordon W. French (General Group Manager, Head of Global Banking and Markets,

---

(August 7, 2014 email attaching "Briefing Note On Pacific Andes Group" examining "Suspicious Trading Activities" involving Solar Fish).
[15]    HSBCHK-TR-00008104.
[16]    HSBCHK-TR-00045207, 45209.

Asia-Pacific) about "confidentiality" and avoiding "leakage to the club loan facility banks that this is being managed in HSBC's risk area," Ms. Duke replied "that in light of the proposed full repayment of the bilateral facilities, HSBC could likely agree that the Banking managers would continue to front the relationship to the club lenders."[18]

### 3. November 10, 2015: Eighth Amendment

46. ~~41.~~On November 10, 2015, the Club Lenders executed the eighth amendment and waiver relating to the Club Facility (the "Eighth Amendment") pursuant to which, among other things, (a) the Club Borrowers and guarantors made certain acknowledgments about prior representations concerning long term supply contracts and (b) CFGL agreed to search for a Chief Restructuring Officer and confer with the Club Lenders regarding the appointment of an investment banker by November 2015 to assist with the sale of the Peruvian Business.

47. ~~42.~~At that time, representatives of Rabobank, Agent for the Club Lenders, visited Lima, Peru. Local management made presentations to representatives from Rabobank and Deloitte regarding the fishmeal business and expected trends for the upcoming anchovy seasons.

48. ~~43.~~Rabobank also attended a meeting with management and BCP. At that meeting, one of BCP's representatives asked for an update from Deloitte and Rabobank regarding the status of payments under the Club Facility. A Rabobank representative confirmed "that

---

[17]   Id. at 45208.

[18]   HSBCHK-TR-00045207, 45211-45212 (Donna Duke notes from December 30, 2014 meeting at Hong Kong office of Pacific Andes International Holdings Ltd.: "NJS asked who is looking after the club facility exposure if the bilateral exposure is repaid? He said to DD that 'if you are fronting this the other banks will change their view and do you want to kill us? I want a truthful answer from you.' NJS went on to say that when he spoke to Gordon French earlier this year he spoke about confidentiality and if there is leakage to the club loan facility banks that this is being managed in HSBC's Risk area, it will kill things. HSBC is not a small bank. DD agreed with NJS's assessment of the perception this would create and said that in light of the proposed full repayment of the bilateral facilities, HSBC could likely agree that the Banking managers would continue to front the relationship to the club lenders."). Ms. Duke no longer works for HSBC and currently works in London.

discussions were happening and that a 1-year extension was probable."[11][19]

> ### D.    NOVEMBER 25, 2015: HSBC INITIATES EX PARTE LIQUIDATION PROCEEDINGS44.

49.    HSBC did not present the FTI Report to the Hong Kong Court in October 2014. Instead, it focused at that time on compelling the Pacific Andes Group to repay its other bilateral facilities with HSBC. After those bilateral facilities were repaid, HSBC turned to the Club Facility.

50.    On November 20, 2015, Mel Blackford, the Global Head of Commercial Banking Fraud Risk at HSBC, explained that HSBC "need[ed] forensic evidence to make an urgent application to" the Hong Kong Court in order to "maximise the recovery" for HSBC on its $100 million exposure.[20]

51.    45.On November 25, 2015, HSBC initiated an action in the High Court of the Hong Kong Special Administrative Region (the "Hong Kong Court") seeking (1) the winding up of

CFGL and CFIL (the "Winding Up Petition"), and (2) the ex parte appointment of joint provisional liquidators (the "JPL Application").

52.    46.HSBC filed the JPL Application and Winding Up Petition on an ex parte basis and without any notice to the CF Group, the Pacific Andes Group, or the other Club Lenders. Also HSBC did not provide the type of undertaking with respect to damages that is ordinarily provided in the context of ex parte applications.

53.    47.On November 25, 2015, the Hong Kong Court held a hearing on the JPL Application, which was attended solely by representatives of HSBC. On that day, and based

---

[11][19]    Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 30.[12]    HSBCHK-TR-00008868. Mr. Paniagua is located in Peru but has submitted declarations in this Court and appeared to testify.
[20]    HSBCHK-TR-00008868.

upon the representations made by HSBC in the JPL Application, the Hong Kong Court granted

the JPL Application and appointed Messrs. Beighton, Middleton, and Power of KPMG to serve

as the JPLs for CFGL and CFIL (the "Hong Kong JPLs").

54.    48.Some or all of the Hong Kong JPLs are the same individuals who had been

working through KPMG as purportedly "independent" financial advisors to the CF Group's

lenders since September 2015 at the request of HSBC. Yet two weeks prior to their appointment

by the Hong Kong Court, in November 2015, Messrs. Beighton, Middleton, and Power signed

their "formal consents and affidavits to court to act as provisional liquidators"1321 for CFGL and

CFIL at the behest of HSBC.

55.    49.Upon information and belief, HSBC's legal counsel, Clifford Chance,

terminated its representation of HSBC and became counsel to the JPLs. In addition, 14 Linklaters

LLP previously served as legal counsel to the JPLs and now represents HSBC.22

56.    50.HSBC had originally requested that KPMG be retained as independent

financial advisors on behalf of the Club Lenders in October 2015.152015.23 It was now executing

on the plan it devised a year earlier in November 2014 to install KPMG as provisional liquidators

over certain members of the CF Group.24

57.    Knowing that the Peruvian OpCos were the CF Group's most valuable assets,

HSBC initiated the liquidation proceeding and sought the appointment of the Hong Kong JPLs

---

1321    Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 65.14    HSBC-HK-TR-00009384. Ms. Ng lives in Hong Kong but has submitted Declarations in this Court and appeared to testify.
22    HSBC-HK-TR-00009384.
1523    Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 53 ("In October 2015, certain lenders and in particular, HSBC, specifically requested that KPMG be retained as independent financial advisor for the benefit of all lenders of the China Fishery Group to review the work conducted by Deloitte Financial Advisory.").16    HSBCHK-TR-8319; HSBCHK-TR-9046.
24    HSBCHK-TR-8319; HSBCHK-TR-9046.

over CFIL and CFGL with the intention of taking control of the Peruvian OpCos.[16]

51.

58.     Instead of presenting the "forensic evidence" that HSBC's Mel Blackford conceded was needed to make the urgent application to the Hong Kong Court, HSBC relied on the FTI Report to make the JPL Applications. The FTI Report, however, did not provide a legitimate basis upon which HSBC could support the JPL Application.[17]Applications.[25]

59.52.     ████████████████████████████████████

 :18:26

HSBCHK-TR-00000260, at 278 ████████████████████

[17][25] S████████████████████████████████████████████g Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern District Of New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶ 114 (negotiations concerning Initial Proposed Divestment of CF Group for $1.6 to $1.7 billion were derailed by appointment of Hong Kong JPLs which action "would ultimately be found to be without merit"); ¶ 115 ("Upon receipt of HSBC's application, the Hong Kong Court, in light of the duty of a party to disclose all material facts (and without HSBC's flagrant breach of this duty), granted on an interim basis appointment of three joint provisional liquidators …. [who] were the KPMG partners who were serving as financial advisors to the Club Lenders in respect of the CF Group restructuring"); ¶ 116 ("[T]he JPLs ignored the conflicts of interest that existed under applicable law as a result of KPMG's role as financial advisor to the Club Lenders which, at the time of their appointment, had not yet been terminated. They also neglected to disclose this dual role to the Hong Kong Court …. In addition, KPMG serves as auditors to certain other companies in the Pacific Andes Group, which KPMG also neglected to disclose to the Hong Kong Court");

¶ 118 ("HSBC's application was based on transactions involving PAIH and PARD. These allegedly suspicious transactions had nothing to do with CFGL or the other Debtors."); ¶ 118 & n. 8 ("The facts which HSBC claimed supported their allegations of impropriety were based on … [the FTI Report] which were, in turn, based on outdated and limited information that was at least 18 months old, and was not verified or discussed with management of PAIH, PARD, or the CF Group. The only information the FTI Report utilized was provided by HSBC or was otherwise publicly available. HSBC had also not informed FTI that it had intended to use the FTI Report for the purposes of its application and FTI had not prepared the FTI Report for such purpose. Indeed, the FTI Report expressly stated that FTI had not arrived at any conclusion. The FTI Report was delivered to HSBC more than 12 months before HSBC made the application for the appointment of the joint provisional liquidators."); see also August 23, 2016 Ng Declaration (Dkt. 105) at ¶ 64 ("Upon HSBC's initial application, the Hong Kong Court, based in part upon the failure of HSBC to disclose all material facts (and without knowledge at the time of HSBC's failure to do so), granted on an interim basis an order for the appointment of three joint provisional liquidators. In addition, HSBC filed a subsequent action in The Cayman Islands based on the Hong Kong proceedings."); ¶ 79 ("Ultimately, after a multi-day trial on whether the appointment of the JPLs should be continued, the Hong Kong Court ruled in favor of our companies and discharged and terminated the JPLs on January 5, 2016. The court vindicated the China Fishery Group and found that the JPLs should not have been appointed over CFGL and CFIL."). Mr. Yee lives in Hong Kong, but has filed declarations with this Court and appeared to testify here.

[18][26]



60.    53. The FTI Report could not credibly form the basis of its JPL Application because, among other things, the FTI Report was based on limited information that was at least a year old and that related to PAIH, PARD—not the Peruvian OpCos. ██████████████████████

████████:1927

_____

1927    Id. (HSBCHK-TR-00000260, at 278).



61.54.

20
28

2028    Id. (HSBCHK-TR-00000260, at 281).

62.    ~~55.~~ Under Hong Kong law, it is the duty of ~~a~~ the party making ~~an~~ the ex parte application to ~~(i)~~ (i) make proper enquiries before bringing the application; and (ii) bring to the court's attention all facts material to the determination of the party's right to that injunction as well as any points that could have been made by the defendant. It is no excuse for the party to maintain that it was not aware of the importance of any facts which it omitted.

63.    HSBC knew the Peruvian Business was not involved in the conduct that was the focus of the FTI Report. Indeed, HSBC's internal documents reflect an understanding that the Peruvian Business was "well managed."[29] An internal HSBC File Note dated November 24, 2015, the day before HSBC made its ex parte application to the Hong Kong Court, noted "Deloitte opined that Peruvian operations are well run business."[30]

64.    The HSBC File Note also shows that HSBC was well aware of the status of the ongoing sale process relating to the Peruvian Business before it commenced liquidations in Hong Kong. HSBC was kept apprised of significant details concerning the sale effort, and was notified that as of November 24, 2015, (a) ten industrial players had expressed interest; (b) five groups of financial investors had expressed interest; (c) those five potential financial buyers had a deadline

---

[29]    HSBCHK-TR-00039216, 39219 (Deloitte presentation).
[30]    HSBCHK-TR-39212.

of December 15, 2015 to submit a signed MOU; and (d) the deal structure under contemplation

was based "upon USD1.7bn Enterprise Value."[31] As set forth in the HSBC File Note:

**S. Sale Process Update**
- Industrial players
  - o  10 have expressed interest. Most are PRC listed companies in commodities trading and animal feed business.
  - o  CFG size is acknowledged too large for any one single investor to absorb therefore likely to partner with financial investors.
- Financial Investors
  - o  At least 5 groups of consortiums has expressed strong interest. Investors cover PE funds, SOE backed funds and private PRC enterprises.
  - o  Strategy to relist assets on A share market or sale to strategic players in China.
- Banks
  - o  PRC lenders have begun analysis of financial performance and deal structure
  - o  Will likely partner with Chinese investors to fund the deal.
  - o  One bank has already visited Peru last week.
- Advisors
  - o  JPM, GS, MS have rejected opportunity to act for CFG given regulatory investigations
  - o  3 are still in discussions: CITIC/CLSA has submitted proposal and pitched deal. UBS and BNP have been contacted and are evaluating the opportunity.
- Contemplated deal structure
  - o  Based upon USD1.7bn Enterprise Value, split USD980m equity and USD720m debt
  - o  Step 1:
    - ▪  CFG to inject Peruvian core operating asset to a 100% owned newco (quota, fishing vessels, processing plants).
    - ▪  CFG to sell 60% of equity in CFG for USD400m to buying consortium.
    - ▪  New lenders are to provide c. USD720m of new debt to newco, with proceeds to be applied to repay existing lenders (USD418m club loan, USD296m senior loan)
  - o  Step 2:
    - ▪  Core operating assets business will be injected into a PRC A listed company for USD980m for 100% equity in cash & shares.
    - ▪  If this does not work there is a supposedly a put option to force CFG to sell the remaining 40% interest in Newco for USD580m to the purchasing consortium in 2 years time
  - o  Timing for 5 potential financial buyers:
    - ▪  By Dec15:      MOU signing and interim financing
    - ▪  By Feb16:      NDA, Data Room, Identify 2 buyers
    - ▪  By May16:     SPA signing, negotiate SPA, sign SPA
    - ▪  By Jul16:       Financial close transaction
  - o  Valuation rationale
    - ▪  USD1.7bn EV assumes 7 year CF forecast, with perpetuity rate (g=2.5%)

65.   56. In light of its duties under Hong Kong law, HSBC should have brought the

following facts to the Hong Kong Court's attention, among others: (i) HSBC's application was

based on a report that focused on transactions involving PAIH and PARD, not CFGL or CFIL

(the entities over which HSBC applied for the appointment of liquidators); (ii) HSBC knew the

Peruvian Business was well-run; (iii) the FTI Report was based on outdated and limited

---

[31]      HSBCHK-TR-39212, 39213.

information; (iiiiv) the FTI Report was not prepared for purposes of the JPL Application; (ivv) the

FTI Report was delivered to HSBC more than twelve months before HSBC made the JPL

Application; (vi) the other Club Lenders did not support the JPL Application; (vivii) the beginning

of the fishing season had just begun in Peru, and granting the JPL Application could harm the

operations of the Peruvian OpCos; and (viii) a sale process was underway, the details of which

HSBC was familiar—including potential bids and upcoming deadlines, and granting the JPL

Application could harm that process.

66.    57.On November 25, 2015—the same day HSBC made its ex parte JPL Application

to the Hong Kong Court—HSBC filed papers in the Grand Court of the Cayman Islands (the

"Cayman Court") seeking a similar order for the appointment of joint provisional liquidators (the

"Cayman JPL Application" and together with the JPL Application, the "JPL Applications").[32]

67.    Notably, Mel Blackford, the Global Head of Commercial Banking Fraud Risk at

HSBC, declined to provide evidence in connection with HSBC's application to the Cayman

Court.

---

[32]    While the Cayman Petition referenced the December 30, 2014 meeting between Ms. Duke and Mr. Ng, ████████████████████████████████████████████████ ████████████████████  hearing on December ████████

On December 8, 2015, the Cayman Court appointed Mr.

Beighton, Mr. Power, and Alexander Lawson (also of KPMG) to serve as provisional liquidators

over CFGL (the "Cayman JPLs" and together with the Hong Kong JPLs, the "JPLs").

69.   ~~58.~~HSBC's action in the Cayman Islands was based in large part on, and

depended on, the interim findings and rulings of the Hong Kong Court.

**E.   CLUB LENDERS DID NOT SUPPORT LIQUIDATION PROCEEDINGS**

70.   ~~59.~~HSBC's appointment of the JPLs came as a "surprise" to the Club Lenders

who considered it a "drastic" move that was "premature."[21][33]

71.   ~~60.~~The absence of Club Lender support for the liquidation proceedings

confirms further that the JPLs' appointment was not necessary to protect creditor interests or

avoid the dissipation of assets.

72.   The Club Lenders were reluctant to initiate any legal actions at that point. For

example, on November 24, 2015, when China CITIC learned that Bank of America, N.A. had

issued a demand letter to Pacific Andes, China CITIC stressed to the Club Lenders that "[a]ny

legal action is not beneficial to the bank group[']s recovery. Please consider giving more time to

the Borrower to orderly sell the assets."[34]

73.   ~~61.~~According to press reports, on December 1, 2015, the Club Lenders attended a

presentation at FTI's offices where FTI explained the contents of the FTI Report, which served as

the basis for HSBC's JPL Applications. The following day, China CITIC informed HSBC that it

did not support the petition to wind up CFGL because it would "seriously affect the disposal of

the Peru assets to an investor who is in advance[d] negotiations with CFGL and will

---

[21][33]   Trustee Dec. at 20.[22]   ~~HSBCHK-TR-00005339.~~
[34]   HSBCK-TR-00039195, 39196.

destroy the value of Peru assets."[35]

74.      The Club Lenders were especially suspicious of HSBC's reliance on the FTI Report as a basis for the Hong Kong and Cayman applications when HSBC had been in possession of the report for more than a year. The Club Lenders suspected that HSBC had waited a year to file the JPL applications so that HSBC could extract repayment of its bilateral indebtedness from the Pacific Andes Group companies in the interim.[36] In addition, these Club Lenders questioned the appointment of KPMG as the Hong Kong JPLs because they previously carried out certain advisory work on behalf of the Club Lenders.[37]

75.      On December 1, 2015, Rabobank's Chief Risk Officer Bernie Nissen told HSBC and the other Club Lenders that there was no "urgent need" to commence a parallel application in Cayman and that HSBC's Hong Kong action was "not fully considered and should in any event have been done in consultation with the wider group of lenders."[38]

76.      62.On December 4, 2015, Rabobank's Chief Risk Officer for Asia, Willem Borgmeier, submitted an affidavit to the Hong Kong Court on behalf of all Club Lenders other than HSBC (i.e., Rabobank, DBS, Standard Chartered, and China CITIC) explaining the other Club Lenders recognized the harm caused by the appointment of the JPLs—namely, the "actual or perceived impediment to a sale of the Peruvian assets"—stating that "the appointment of provisional liquidators at CFIL and CFGL has caused significant instability both with the local management and with the local Peruvian lenders who provide working capital finance." Mr.

---

[35]      HSBCHK-TR-00005339.
[36]      HSBCHK-TR-00020224, 20226 ("The lenders have been suspicious of HSBC because the bank had since November 2014 possessed the FTI Report (which suggests that there is fraudulent trading activity with the Pacific Andes Group) but the bank waiting a full year to act on the FTI reports contents by winding up the company. The lender group alleges that HSBC waited a year to wind up the company so that a large portion of the debt that was owed to it by China Fishery could be repaid.").
[37]      HSBCK-TR-00039343, 39346 (¶ 12).
[38]      HSBCHK-TR-00041581, 41582.

Borgmeier explained that "[t]hese facilities are critical to enable the Company to continue trading during the current fishing season and to maintain the business and assets as a going concern which is considered to be in the best interests of all stakeholders."23 39

77. 63.On December 4, 2015, the Club Lenders proposed an "alternative solution" to the appointment of the JPLs at CFGL and CFIL which they believed would protect the Club Lenders and other stakeholders by providing a means to monitor CFGL's operations, while simultaneously reducing the risk of destruction to the value of the Peruvian Business and promoting the sale process.24 40

78.64.



25
41

79.      65.The Club Lenders' viewThe Club Lenders' view reflected that of Deloitte, the financial advisor engaged by the Debtors to provide transparency to the Club Lenders. Deloitte reached out directly to HSBC to discuss how the FTI Report did not relate to the Peruvian OpCos and "how the value of the [Peruvian] Fishmeal business can be maintained and the business sold;" to note "the Peru based management appear to be completely separate from the Hong Kong business operations and transactions," and "the Peru business is and can be ring fenced;" and to stress they "should all work to find a structure and sale process which you and all lenders are comfortable with and which mitigates the risks of destroying value being extracted from the sale of the Peruvian Fishmeal assets. I do not believe a sale by an Insolvency Practitioner led process is going to do

---

23 39      Affirmation of Willem Borgmeier, dated December 4, 2015 (Dkt. 58-9).
24 40      Trustee Dec. at 20.

██████████████████████████████████████████████

26 66.

27

this."[42]

80.    On January 7, 2016, HSBC acknowledged internally that "the company and other banks are still trying to seek an agreement from HSBC to withdraw its actions."[43]

81.    HSBC similarly noted internally that "[o]ther Club Lenders have indicated a preference for a consensual resolution and have supported the companies in seeking removal of the PLs. The outcome is uncertain at this point in time."[44] As the JPL's counsel observed, "there is a substantial majority of those CF creditors which express a view which support management regaining control …. because of a perception that management are somehow more likely to procure an outcome which produces a significant return to creditors of PARD and PAIH."[45]

### F.    LIQUIDATION PROCEEDINGS HARM PERUVIAN OPERATIONS

82.    67. The fishing season began on November 17, 2015, just eight days before HSBC caused the JPLs to be appointed and the lowest point in the CF Group's annual cash cycle.

83.    68. The Hong Kong JPLs wasted no time in proceeding as HSBC's surrogates to wrest control of CFG Peru and the Peruvian OpCos from local management in Peru and

---

[35] [41]    HSBCHK-TR-00000260, at 279-80.
[42]    HSBCHK-TR-00014495, at 14497.
[43]    HSBCHK-TR-00010019.
[44]    HSBCHK-TR-00032745, 00032748.

consummate a prompt sale of the CF Group so that HSBC's portion of the Club Facility could be satisfied.

84.    ~~69.~~The Hong Kong JPLs traveled to Peru to meet with local suppliers and lenders to the Peruvian OpCos.

85.    ~~70.~~On or about November 30, 2015, the Hong Kong JPLs, together with their Hong Kong counsel, met with BCP—the Peruvian OpCos' primary working capital provider—without

anyone from the CF Group present.

~~26    HSBCHK-TR-00014495, at 14497.~~

~~27    HSBCHK-TR-00010019.~~

86.    ~~71.~~Shortly after the Hong Kong JPLs met with BCP, BCP suspended its $100 million facility. The main reason for its suspension of the facility was the appointment of the JPLs.~~28~~46 BBVA and Scotia Bank also suspended their facilities.

87.    ~~72.~~Management in Peru had no alternative but to secure alternative financing with a competitor to the Peruvian OpCos (a fishmeal company named Hayduk). This alternative financing, however, came at a significantly increased cost.

88.    ~~73.~~The financing alternatives were not sufficient to meet the CF Group's needs, severely hampering operations and resulting in lost revenues. Losses also were incurred because the CF Group was forced to suspend a renovation project to increase capacity at one of its plants, which precluded the plant from processing any fishmeal.

89.    ~~74.~~The 2016 revenue of the Peruvian OpCos as of June 30, 2016 was $114.8 million, with EBITDA of approximately $22.1 million, which was worse than the financial

45    HSBCHK-TR-00018953, 18955.
~~28~~46    Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 34 ("During the evening of November 30, 2015, the JPLs met with BCP without anyone from the Peruvian Companies present. Soon after the JPL's arrival in Peru, BCP suspended our $100 million credit line and allowed us to borrow only $8 million in short term inventory financing."); August 23, 206 Obj. (Dkt. 103) ¶ 33 ("As a result of the appointment of the JPLs and their actions, BCP reduced availability to only $8

performance of the Fishmeal Companies during a normal fishing season.[29][47]

90.   ~~75.~~ In a letter dated December 7, 2015, the Hong Kong JPLs attempted to take control of CFG Peru and its assets, threatened local management in Peru with potential personal liability if they did not comply with their demand to convene shareholders meetings and appoint new representatives. The letter advised that the "Company's assets … include all assets of CFG Peru Investments and its subsidiaries" and warned that "[s]hould you in any way facilitate any action by the Board of Directors [of CFGL] in relation to these subsidiaries without first notifying and obtaining the consent of the JPLs, we again reserve our rights to hold you personally liable."[30][48]

G.   HONG KONG COURT DISMISSES HSBC'S JPLS; HSBC SECURES UNDERTAKING

91.   ~~76. On January 5, 2016, following a trial held on~~ Over four days in December ~~30-31,~~ 2015 and January ~~4~~ 2016, the Hong Kong Court held an evidentiary hearing to consider the merits of HSBC's application to appoint JPLs over CFGL and CFIL. Thereafter, on January 5, 2016, the Hong Kong Court discharged and terminated the Hong Kong JPLs' appointment. The Hong Kong Court found that the Hong Kong JPLs never should have been appointed over CFGL and CFIL to begin with and that HSBC failed to present credible evidence justifying the appointment of the JPLs in the first place.[31][49]

92.   The Hong Kong Court's decision discharging the JPLs was issued by Deputy High Court Judge Kenneth Kwok, SC on January 5, 2016, and the Reason for Decision was handed down on March 17, 2016 (collectively, the "Hong Kong Court Decision"). The Hong

---

[29][47]   Aug. 23, 2016 Paniagua Decl. (Dkt. 99) ¶ 45.

[30][48]   Letter dated December 24, 2015 (Dkt. 99-1) ("KPMG representatives have replaced the previous directors of CFG Peru Investments Pte. Ltd ('CFG Singapore') and, therefore, we now have control over CFG Peru Singapore … [and the Peruvian Subsidiaries]").

[31][49]   See Declaration Of Ng Puay Yee Pursuant To Rule 1007-2 Of Local Bankruptcy Rules For Southern District Of New York And In Support Of Debtors' First Day Motions And Applications (Dkt. 2) ¶¶ 114-18; see also August 23, 2016 Ng Declaration (Dkt. 105) at ¶¶ 64, 79.

Kong Court Decision was filed under seal, and HSBC will not agree to have it unsealed.

93.     HSBC was not surprised at the Hong Kong Court's decision to discharge the Hong Kong JPLs and expected it would happen—though concern was expressed internally that the discharge would cause reputational damage to the bank.

94.     77. Despite having been dismissed by the Hong Kong Court on January 5, 2016, the Hong Kong JPLs did not step down immediately and instead sent letters to the Peruvian management team on January 6 and January 11 continuing to demand that local management call a shareholders meeting.

95.     78. HSBC also threatened to appeal the dismissal of the Hong Kong JPLs and to proceed with the Winding Up Petition in Hong Kong. And, even though HSBC commenced the Cayman Islands action based in large part on the initial findings of the Hong Kong Court, HSBC insisted on proceeding with the winding up petition in the Cayman Court.

96.     79. HSBC imposed onerous demands on CFGL and CFIL in exchange for a six-month suspension of the Cayman winding up petition and dismissal of the appeal from the Hong Kong Court order terminating the Hong Kong JPLs. Rabobank (a similarly situated Club Lender) In response, complained that "HSBC has so far not moved on any major points with the company providing concessions." In response, the HSBC employees overseeing negotiations

agreed that HSBC "need[s] to keep our foot on their throats here…".[50]

[32]

97.   80. During these negotiations, the other Club Lenders were "deeply suspicious" of HSBC's motives.[51] These negotiations culminated in the execution of a Deed of Undertaking, dated January 20, 2016 (the "HSBC Undertaking"), pursuant to which, inter alia, CFGL and

CFIL agreed to pursue a sale of the Peruvian Business to be completed by July 15, 2016 and to

appoint Paul Brough as Chief Restructuring Officer ("CRO") to oversee the sales process. They also agreed to pay $3.1 million to KPMG for the fees of the Hong Kong JPLs—before the court approved those fees and notwithstanding HSBC's agreement to indemnify the JPLs.[52] Failure to comply with the HSBC Undertaking entitled both HSBC and Bank of America, N.A. (which was not a signatory, but was a beneficiary to the HSBC Undertaking) to "be at liberty to apply to the Cayman Court for the immediate reappointment of the JPLs … and the CF Parties hereby consent to such appointment."[33][53]

98.   81. Given the continuing damage to the Peruvian Business caused by unresolved foreign liquidation proceedings, HSBC had put "a gun to [the] head" of the Pacific Andes Group.[34][54]

82.

---

[50]       HSBCHK-TR-00010048, 10052.
[51]       HSBCHK-TR-00020224, 00020226 ("HSBC's proposal for Borrelli Walsh to be appointed made the club lenders—already deeply suspicious of HSBC motives—even more suspicious. This is because, among other things, Donna Duke is leaving HSBC for Madison Pacific, which is very close to Borelli Walsh, which among other things is a shareholder of Madison Pacific.").
[52]       HSBCHK-TR-00019439, HSBCHK-TR-00019468, 00019469.
[33][53]   Trustee Dec. at 23-24.
[34][54]   August 29, 2016 Hr. Tr. at 198:12 (Dkt. 157).
[35]       HSBCHK-TR-00003606.   [36]       HSBCHK-TR-00003606.

99.    As explained in an internal HSBC email, the CF Group "acquiesced at the 11th hour" before the liquidation hearing in the Cayman Islands. Mark Mckeown, HSBC's Chief Risk Officer, Asia Pacific, observed that "[g]iven the pressure we have had from other creditors, I think this is as good as we could hope for."[55]

100. 83.HSBC understood fully the level of control the undertaking provided, remarking internally that "[w]e retain good control and can re-kick in Liquidators but they still have to sell the asset …."[56]

[32] HSBCHK-TR-00010048, 10052.

101. 84.HSBC improperly secured the JPLs' appointment by violating its duty of full and frank disclosure to the Hong Kong Court. Understanding that all parties appreciated the damage caused by ongoing liquidation proceedings, HSBC weaponized the JPLs' appointment, its ability

to continue the Cayman winding up petition, and its ability to appeal the Hong Kong JPLs' dismissal, in order to secure repayment of its loan and specifically to extract concessions in negotiating the HSBC Undertaking in January. Through that undertaking, HSBC retained control over CFGL and the entire CF Group by extension as well as the sale process for the Peruvian Business.

### H.    STIGMA OF LIQUIDATION PROCEEDING LINGERS AFTER JPLs ARE DISMISSED

102. 85.Following dismissal of the Hong Kong JPLs, management in Peru met with local Peruvian banks in an attempt to reinstate inventory financing, without which the Peruvian OpCos could not support operations for the upcoming season. Moreover, employees were threatening to strike for lack of payment, and overdue taxes and delinquent supplier accounts

---

[55]    HSBCHK-TR-00003606.

needed to be satisfied.86.

103.    .37 As Mr. Brough explained in an email to the Club Lenders on February 19, 2016, "[t]he Peruvian business has been without working capital for almost three months … due to the appointment of the JPLs", as well as the suspension of certain interest payments, i.e., the interest payments of the 9.75% Senior Notes due 2019.57 The Hong Kong Court's appointment of the Hong Kong JPLs triggered a cross default with respect to the 9.75% Senior Notes due 2019 which are guaranteed by CFG Peru.

104.    87.Mr. Brough similarly acknowledged that "[t]he Peruvian banks which previously supported the Peruvian Business' working capital needs have been shaken, firstly by the appointment of the JPLs and secondly by the default of the Notes."58

38

105.    88.Given the inability of the Peruvian OpCos to obtain long-term financing, Mr. Brough requested the Club Lenders provide up to $25.5 million of new financing to sustain operations through the first fishing season of 2016. HSBC declined to participate in this funding, despite the fact that it was considered necessary by the individual HSBC selected to serve as CRO. HSBC instead contemplated another threat to institute liquidation proceedings.3959 Mr. Brough described HSBC's conduct as "unprofessional."4060

106.    89.Ultimately, on June 30, 2016, involuntary proceedings to restructure and/or refinance the debts of the Peruvian Companies were commenced before El Institute Nacional de Defensa de la Competencia y de la Proteccion de la Propiedad Intelectual (the National Institute

---

56        HSBCHK-TR-00003606.

3757      HSBCHK-TR-00007076.

58        HSBCHK-TR-00007026.

59        HSBCHK-TR-00007375 ("My view is that we should continue to take a hard stance here and may have to be prepared to reinstate the PL's; or at least threaten such").

4060      Aug. 23, 2016 Ng Decl. (Dkt. 105) ¶ 91.

for the Defense of Competence and Protection of Intellectual Property, also known as

"INDECOPI") under the laws of the Republic of Peru and in particular, the General Law of the

Bankruptcy System (Law No. 27809) (the "Peruvian Insolvency Law").

107. 90. HSBC sent letters to INDECOPI in August 2016 (even though creditors are not

supposed to participate in the proceedings until they are recognized formally). It also attempted

to have CFGI's and Copeinca's INDECOPI proceedings withdrawn by buying certain creditors'

claims against them.41 61

I.    **HSBC INTERFERES WITH SALE PROCESS**

108. 91. In the fall of 2015, before HSBC applied for the appointment of the Hong

Kong JPLs, Pacific Andes Group management was contemplating a measured and deliberate

process

38    HSBCHK-TR-00007026.

39    for th█████████████████████████████████████████████████████████
value. ██████████████████████████████

---

41 61    Notice of Subsequent Information Pursuant To § 1518 Of Bankruptcy Code (Dkt. 18 (Case No. 16-11891))
¶¶ 5-8.

109. ~~92.~~At a presentation made by Deloitte on September 25, 2015, Deloitte valued the assets of the Peruvian OpCos at $1.69 billion.~~93.~~

110. ~~42~~According to materials prepared by Deloitte in mid-November 2015, an investment bank was being appointed to run a sale process, and during the week of November 15, 2015, a potential buyer of the Peruvian fishmeal business was performing a site visit.[62]

111. ~~94.~~At the start of the sale process, CITIC CLSA valued the Peruvian Business at $1.7 billion.~~43~~[63]

112. As HSBC's File Note from November 24, 2015 confirms, at that time, there were several interested parties and the deal structure contemplated an enterprise value of approximately $1.7 billion.[64]

113. ~~95.~~In November 2015, Pacific Andes management was in advanced negotiations with two investment groups regarding the acquisition of some or all of the CF Gr

█████████████████████████████████████████████

███████████████████████████████████████████

███████ :~~44~~[65]

---

[42] ~~HSBCHK-TR-00009826.~~

HSBCHK-TR-00000260, at 267; at 278 ███████████████
███████████████████████████████
███████████████████████████████
███████████████████

[62] HSBCHK-TR-00009826.
[43][63] Trustee Dec. at 29.~~44~~
[64] HSBCHK-TR-39212, 39213.

[65]



114.    96.The appointment of the Hong Kong JPLs and the specter of liquidation altered

the environment in which the sale was being conducted, inviting lower bids. For example,

97.

46

45    HSBCHK-TR-0000260, at 279-280.
46    HSBCHK-TR-00008874.

owed USD 1.2bn by the Opcos."[67]

116.    98.In addition to the alteration of the sale environment brought about by HSBC's commencement of liquidation proceedings in Hong Kong, the compressed time frame imposed by HSBC in the HSBC Undertaking chilled bidding.

117.    99.HSBC knew that even in a rushed sale consummated by liquidators, the value realized for the Peruvian Business would satisfy its portion of the Club Facility. HSBC noted internally that its January undertaking provided "unopposed authority for HSBC to liquidate the company should a trigger even occur, including the resignation of the CFO, or advice from the CRO that the sale process is being delayed or frustrated by the directors. We believe this is a good outcome for HSBC and the other creditors of CFG. The asset has more than enough value to see us repaid in full …"[68]

47

100.

48

118.    On March 15, 2016, HSBC's Mr. Mckeown explained the message that should be delivered to Mr. Brough: "if [the CF Group does] not deliver we will do what is necessary, including [re]instituting the [JPLs]; the other lenders can take us out if they wish."[69]

119.    101.By June 1, 2016, seven non-binding expressions of interest had been received for the Peruvian Business, and more than half of the bids were considered to be worth progressing to the second round of the sale process. One of the expressions of interest was for $1.5 billion--$200 million below the pre-appointment indication of interest that nearly resulted in a

---

[67]    HSBCHK-TR-00008874.
[68]    HSBCHK-TR-00013710.

memorandum of understanding—but the indicating party refused to take the necessary next steps to sign a "process letter" to proceed to the next round of the sale process. The remaining non-

binding expressions of interest that were received were for much lesser amounts.~~49~~70 Indeed, at that time, HSBC "expect[ed] to receive a price starting with a 9"[71]—a significantly lower number from the $1.7 billion under consideration before HSBC capriciously commenced the liquidation proceedings.

~~47    HSBCHK-TR-00013710.~~

~~48    HSBCHK-TR-00007376.~~

### ~~J.~~ CHAPTER 11 CASES COMMENCED IN NEW YORK

120. ~~102.~~On ~~June 30, 2016 (the "~~the Petition Date~~"),~~, June 30, 2016, the Debtors, including CFG Peru, filed voluntary petitions with the ~~United States Bankruptcy Court for the Southern District of New York (the "Court")~~Court for relief under chapter 11 of the Bankruptcy Code.~~On July 14, 2016, the Court entered an order consolidating the chapter 11 cases (together, the "Chapter 11 Cases") (Dkt. 27).~~

121. ~~103.~~On October 28, 2016, the Court granted the motion of Rabobank U.A., Standard Chartered, and DBS seeking the appointment of a chapter 11 trustee pursuant to section 1104(a)(2) of the Bankruptcy Code (Dkt. 203). On November 10, 2016, the Court confirmed the appointment of William A. Brandt, Jr. as the chapter 11 trustee for CFG Peru (Dkt. 219)

122. ~~104.~~When appointing the Trustee, the Court observed that CFG Peru "is the 100% direct and indirect owner of the Peruvian OpCos" and that "[w]hatever value [the Debtors] have is

[69]    HSBCHK-TR-00007376.

~~49~~70    Trustee Dec. at 26-27.

[71]    HSBCHK-TR-00018131.

derived from their mostly indirect interests in the Peruvian operating companies." The Court also found "the Debtors have no prospect of rehabilitation if they cannot realize value from their interests in the Peruvian OpCos." The Court charged the Trustee with, among other things, evaluating "the optimal way to maximize the value of the Peruvian Business and to determine how to realize that value for the benefit of the Debtors' estates and creditors." See In re China Fishery Grp. Ltd. (Cayman), No. 16-11895 (JLG), 2016 WL 6875903, at *2, *20 (Bankr. S.D.N.Y. Oct. 28, 2016).

123.    105.In addition to owning the equity in the Peruvian OpCos, CFG Peru is a creditor and party in interest in the same chapter 11 cases in which HSBC filed proofs of claims. CFG

Peru and HSBC each filed proofs of claim in the chapter 11 cases for CFGL (Case No. 16- 11895), CFIL (Case No. 16-11896), N.S. Hong (Case No. 16-11899),[72] and Smart Group (Case No. 16-11910). A chart detailing the proofs of claim filed by CFG Peru and HSBC is set forth in Figure 1, below.

---

[72]    After it filed the Complaint, CFG Peru withdrew its claim against N.S. Hong. See Dkt. No. 1327 (Stipulation). CFG Peru has filed proofs of claim against other debtor entities that are located above CFGL in the capital structure, e.g., PARD (Claim No. 1774), Zhonggang Fisheries Limited (Claim No. 1534 ), and Golden Target Pacific Limited (Claim No. 1520).



106.Figure 1. Proofs of Claim Filed in Chapter 11 Cases.

124.    On December 27, 2016, the Trustee filed a motion seeking discovery from HSBC pursuant to Federal Rule of Bankruptcy Procedure 2004. On January 9, 2017, the Trustee filed his application to retain Quinn Emanuel Urquhart & Sullivan LLP in the jointly administered Chapter 11 Cases [ECF No. 303] and in CFG Peru's Chapter 11 Case [ECF No. 54].

125.    On January 31, 2017, HSBC filed in the jointly administered Chapter 11 Cases its Notice Of Appearance And Request For Service Of Papers [ECF No. 332] (the "Notice Of

Appearance"). The Notice Of Appearance relates to "the above captioned chapter 11 cases"—

which include CFG Peru—identifies attorneys from Davis Polk & Wardwell LLP and Boies

Schiller & Flexner LLP as counsel to HSBC, and demands, pursuant to, inter alia, section

1109(b) of the Bankruptcy Code, that they receive "all notices given or required to be given in

connection **with the Cases** ..." (emphasis added).

126.    On January 31, 2017, HSBC objected to the Trustee's application to retain Quinn

Emanuel as special litigation counsel in the jointly administered Chapter 11 Cases, arguing the

Trustee's retention of Quinn Emanuel "to investigate and potentially litigate against" HSBC

would be "both inappropriate and unwarranted."[73] On February 6, 2017, HSBC objected to the

Rule 2004 Motion in the jointly administered Chapter 11 Cases.[74] In addition to opposing the

Trustee's examination, the objection HSBC filed to the Trustee's Rule 2004 Motion requested

extraneous relief unrelated to the proposed investigation.[75] At HSBC's request, the Trustee

granted one extension with respect to HSBC's response deadline for the Quinn Emanuel retention

application. HSBC also requested two extensions of the response date with respect to the Rule

2004 Motion, which the Trustee granted.[76]

---

[73]    See Limited Obj. of HSBC to the Appl. Of William A. Brandt, Jr., Chapter 11 Trustee, for Entry of an Order Authorizing Retention and Employment of Quinn Emanuel as Special Litigation Counsel at ¶¶ 2-3, In re China Fishery Grp. Ltd. (Cayman) (No. 16-11895), Dkt. No. 333.

[74]    See Obj. of HSBC Limited to the Mot. Of William A. Brandt, Jr., Chapter 11 Trustee, for Order Authorizing Issuance of Subpoenas to HSBC, In re China Fishery Grp. Ltd. (Cayman), (No. 16-11895), Dkt. No. 344 (the "Retention Obj.").

[75]    See Retention Obj. at 4-5 (¶ 8) ("Discovery aside, the Court should conduct a broader review of the progress of these chapter 11 cases and whether there is any real prospect of the Trustee and the Debtors bringing them to an expeditious and successful conclusion."); at 5 & n. 6 (reserving right "to request dismissal of the chapter 11 proceeding or, alternatively, to lift the automatic stay to allow foreign proceedings to continue"); at 17 & n. 16 ("In any event, objecting to [HSBC's] Proofs Of Claim is unlikely to bring any additional value to stakeholders in CFG Peru or the other Debtors. Because two of the non- Debtor Peruvian OpCos are obligors for the full amount of the Club Facility, the Club Lenders (including [HSBC]) are entitled to be repaid *in full* by those entities before any equity value from the Peruvian OpCos flows to CFG Peru or any other Debtors."); at 23 & n. 24 ("This filing constitutes [HSBC's] notice that it intends to raise an issue about a foreign country's law.").

[76]    See First Am. Notice with respect to Retention Appl., In re China Fishery Grp. Ltd. (Cayman) (No. 16- 11895), Dkt. No. 321; First Am. Notice with respect to Rule 2004 Mot., In re China Fishery Grp. Ltd.

**J.** **WAS AN INSIDER OF PACIFIC ANDES COMPANIES**

127.    HSBC was an insider of the Pacific Andes Group during all relevant periods—namely, before the appointment of the JPLs; during the JPLs' abbreviated tenure; and after the Deed of Undertaking was executed.

128.    Before the JPLs were appointed, HSBC was acting in concert with the Pacific Andes Group to obtain repayment of its bilateral credit facilities and keeping from the other Club Lenders the fact that the Pacific Andes loans were being managed in HSBC's risk area. It also started developing an internal strategy to have KPMG installed as provisional liquidators. HSBC fortified its role as an insider when it filed the ex parte JPL Applications. HSBC installed the liquidators to exercise control over CFGL and CFIL and the "crown jewels" of the Pacific Andes Group—i.e., the Peruvian OpCos. And, HSBC wielded the "life or death" power it obtained by virtue of the JPLs' appointment (and its ability to appeal from the decision dismissing the JPLs) to extract the Deed of Undertaking. As it privately acknowledged, HSBC was "keep[ing its] foot on their throats", and the Deed of Undertaking allowed HSBC to "retain good control."[77]

129.    HSBC also facilitated the appointment of its own retained professionals into control positions within the Pacific Andes Group. Specifically, FTI, the same firm that HSBC hired to write the report it used as the basis for its unfounded JPL Applications, ultimately served as liquidators for certain Pacific Andes Group companies. On October 31, 2016, the High Court of Justice of the British Virgin Islands, Commercial Division (the "BVI Court") appointed three joint provisional liquidators to serve with respect to Pacific Andes Enterprises (BVI) Limited:

---

(Cayman) (No. 16-11895), Dkt. No. 322 ; Second Am. Notice with respect to Rule 2004 Mot., In re China Fishery Grp. Ltd. (Cayman) (No. 16-11895), Dkt. No. 330 .

---

[77]    See HSBCHK-TR-00010048; HSBCHK-TR-00003606.

Mr. Ian Morton, Mr. Nick Gronow, and Mr. Joshua Taylor of FTI (the "BVI Liquidators").[78] On November 18, 2016, the BVI Court appointed the Liquidators to serve with respect to Parkmond Group Limited and PARD Trade Limited after placing those companies into liquidation.[79] One affiliate, Richtown Development Limited, challenged the BVI Liquidators' appointment on the ground that they had prepared the FTI Report at HSBC's direction.[80] Notably, HSBC had commissioned the creation of reports drafted by FTI that FTI provided to these courts to secure its appointments.[81]

130.    On January 30, 2018, the Trustee filed a formal application with the Hong Kong Court requesting that it unseal the 2016 Hong Kong Court Decision so that whatever findings the court made with respect to HSBC's conduct would be publicly disclosed. HSBC strenuously opposed the Trustee's application and demanded that the decision must remain under seal. The Hong Kong Court sided with HSBC, refused to recognize the legitimacy of this Court's appointment of the Trustee, and declined to unseal the Hong Kong Court Decision.[82] However, the Hong Kong Court did remark, when denying the Trustee's application, that the Hong Kong Court Decision found the CF Group was "involved in a restructuring exercise and that it was in

---

[78]     See Disclosure Statement for Joint Chapter 11 Plain of Reorganization of Pacific Andes International Holdings Limited (Bermuda) and Certain of its Affiliated Debtors, at 28-29 [ECF No. 801].

[79]     See id. at 29-30. On February 13, 2017, at the requests of Maybank and Glacier Fish Company, the BVI Court appointed the Liquidators to serve with respect to Europaco Limited (BVI). Id. The Liquidators also serve with respect to Solar Fish Trading Limited, Palanga Limited, Zolotaya Orda Limited, Richtown Development Limited, Metro Win Inc. Limited, Alatir Limited, and Perun Limited.

[80]     See 45-BVIHC-132, 133, 134 (2016) (BVI Court Decision) at 30 ("Richtown opposed the appointment of the individuals who had acted as joint provisional liquidators on the basis that as persons from FTI consulting, they would have a conflict interest in acting. The conflict was said to be between their duties as liquidator and their self-interest in seeking to justify the preliminary FTI Consulting reports to HSBC which were used, as I understand it, as evidence for the appointment of provisional liquidators in the Cayman Islands and Hong Kong …. [T]he individuals were professional men, and [ ] the objection to their appointment was ill-founded.")).

[81]     See, e.g., Proof Of Claim No. 63-1 (¶ 1 ("In appointing the Liquidators act, the BVI Court was aware of the two reports issued by FTI Consulting (Hong Kong) Limited dated November 16, 2015 and December 18, 2015, (collectively, the '2015 Reports'), on the instruction of counsel for the The Hongkong And Shanghai Banking Corporation Limited, as well as two reports prepared for the BVI Court by Nicholas James Gronow, Ian Morton and Joshua Taylor as joint and provisions liquidators of PAE dated November 4, 2016 and November 17, 2017.").

[82]     HCMP 134/2018 [2018] HKCFI 2622 (Reasons For Decision) at 18:D-H ("It follows that there is no basis for recognising the Trustee's office or providing assistance to him."); at 9:L-O ("Viewed from this Court's

the interests of 'stakeholders' that there was an orderly disposal of assets rather than a compulsory winding up and that this was a reason for discharging an order."[83] HSBC continues to insist that the Hong Kong Court's decision cannot be reviewed by this Court or otherwise be made publicly available.

### FIRST COUNT Peruvian Civil Code Articles ~~1969, 1981,~~1969 and 1985 (Malice or Negligence)

131.   ~~107.~~The Trustee repeats and realleges the allegations in paragraphs 1 through ~~106~~130 above, as if fully set forth herein.

132.   ~~108.~~Under Article 1969 of the Peruvian Civil Code, a defendant who causes harm to a plaintiff, by either malice or by negligence, is forced to compensate the plaintiff. The burden is on the defendant to prove that it did not act with malice or negligence.

~~109.Under Article 1981 of the Peruvian Civil Code, where one party directs another party to perform an act that causes damage, both parties are subject to joint and several liability for the damage caused.~~

133.   ~~110.~~Under Article 1985 of the Peruvian Civil Code, compensation for damages includes the consequences that derive from the action or omission that generates the damage, including loss of earnings, damage to the person, and moral damage. The amount of compensation accrues legal interest from the date on which the damage occurred.

134.   ~~111.~~Parties filing an ex parte petition for the appointment of provisional liquidators in Hong Kong have a duty to fully and frankly disclose all material facts to the deciding court.

---

perspective the Chapter 11 filings by the Companies and the Group were, therefore, unconscionable conduct that the application to the appoint the Trustee became possible"); at 20:H-Q ("It seems to me that this approach ignores the fact that the Chapter 11 proceedings, and consequently the Trustee's appointment, is the consequence of what appears to be a conscious fraud on the part of the Ng family on HSBC and this Court.

[83]   HCMP 134/2018 [2018] HKCFI 2622 (Reasons For Decision) at 9:O-R; 10:F-I. Notably, when denying the Trustee's motion to unseal the prior decision dismissing the Hong Kong JPLs, the Hong Kong Court noted that "it is not for me to assess whether or not the [Hong Kong Court] was wrong to set aside the order appointing the provisional liquidators." Id.

Public policy considerations weigh heavily in favour of declining to provide any form of assistance to a process that arises in this way.").

112.

135.    HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte application that it either knew or should have known.

136.    113.Among other things, HSBC had a duty to inform the Hong Kong Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose. HSBC should have informed the Court of the status of the sale process, with which HSBC was familiar, and that it understood the Peruvian Businesses were well run. HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court. HSBC knew its evidence was flimsy and was not surprised that the JPLs were discharged.

137.    114.There was no need to appoint liquidators because there was no risk of dissipation of assets, a fact that HSBC understood and that was corroborated by the lack of support among the other Club Lenders for those proceedings and, their concern that the appointment of liquidators not only damaged operations but also damaged the companies' value and obstructed the sale process, and their suspicion that HSBC did nothing with the FTI Report for more than a year while it secured the repayment of its bilateral facilities. That suspicion was well-founded, considering that HSBC had agreed with Pacific Andes Group management to keep from other Club Lenders the fact that the Pacific Andes' loans were being managed in HSBC's risk area.

138.    115.Largely on the basis of the Hong Kong Court's decision, the Cayman Court also appointed provisional liquidators.

139.    116.The Peruvian OpCos are the cornerstone of the Trustee's restructuring

efforts in the United States. As a result of the appointment of the JPLs and HSBC's collection

efforts

thereafter, including the HSBC Undertaking, the Peruvian OpCos and CFG Peru suffered damages

resulting from lost revenue and profit, increased financing costs, and lost capacity. The

appointment of the JPLs also caused a substantial decrease in the value of CFG Peru's equity

interest in the Peruvian OpCos because it caused the companies' operations to contract and

interfered with a process for a measured and deliberate sale of those companies.

140.    117.Before the appointment of the JPLs, indications of interest totaled as much as

$1.7 billion. After the appointment, they were much lower—by at least $200 million. While one

indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed

to the next round of the sale process. The remaining non-binding expressions of interest that were

received were in much lesser amounts. HSBC expected to receive a "price starting with a 9."[84]

141.    118.From and after November 25, 2015, HSBC exerted control over the CF Group

by, among other things, having the JPLs appointed, sending them as its surrogates to Peru

immediately after their appointment to attempt to take control of CFG Peru and the Peruvian

OpCos, to meet with the Peruvian OpCos' lenders in a manner that disrupted those relationships,

obtaining the HSBC Undertaking, and dictating the terms of the sale process for those entities.

**SECOND COUNT Peruvian Civil Code Articles 1978, 1981,1981
and 1985 (Vicarious Liability)**

142.    119.The Trustee repeats and realleges the allegations in paragraphs 1 through

118141 above, as if fully set forth herein.

143.    Under Article 1981 of the Peruvian Civil Code, where one party directs another

party to perform an act that causes damage, both parties are subject to joint and several liability

for the damage caused.

120.

144.    Under Article ~~1978~~1985 of the Peruvian Civil Code, ~~a defendant who helps to cause damage is also responsible for that damage, in an amount determined by the judge according to the circumstances of the case~~compensation for damages includes the consequences that derive from the action or omission that generates the damage, including loss of earnings, damage to the person, and moral damage. The amount of compensation accrues legal interest from the date on which the damage occurred.

145.    ~~121.~~Messrs. Beighton, Middleton, and Power—the Hong Kong JPLs—were previously selected by HSBC to serve as independent financial advisors for the Club Lenders. Prior to their appointment by the Hong Kong Court, these individuals purported to represent all CF Group lenders. However, during that time period, unbeknownst to the other Club Lenders, they were preparing to be installed as provisional liquidators at HSBC's behest and without the support of the other Club Lenders.

146.    ~~122.~~The Hong Kong JPLs were the surrogates of, and controlled by HSBC. HSBC used its hand-picked Hong Kong JPLs (with whom it shared legal counsel) to attempt to take control of CFG Peru and the Peruvian OpCos and to exercise control over the Peruvian Business. HSBC also agreed to indemnify the Hong Kong JPLs in connection with their appointment. Once appointed, the Hong Kong JPLs also insisted on meeting with the creditors and prospective buyers of the Peruvian assets. And within six weeks of their appointment, the Hong Kong JPLs had already been in contact with twenty-one potential buyers for the Peruvian Business in an effort to sell them as quickly as possible for the benefit of HSBC.

147.    ~~123.~~The Hong Kong JPLs caused significant harm to CFG Peru's equity interest in the Peruvian OpCos and to those companies themselves by, among other things, causing the Peruvian OpCos to lose access to liquidity needed to operate their businesses from banks that

[84]    HSBCHK-TR-00018131.

provide working capital and warehouse companies and other forms of inventory financing and impaired fishing operations.

148. ~~124.~~Before the appointment of the JPLs, indications of interest totaled as much as $1.7 billion. After the appointment, only one indication of interest came close to that amount ($1.5 billion, but that bidding party refused to take the necessary steps to proceed to the next round of the sale process), resulting in at least a $200 million decline in the bids. The remaining non- binding expressions of interest that were received were in much lesser amounts. HSBC expected to receive a "price starting with a 9."[85]

149. ~~125.~~After HSBC had the JPLs installed, the JPLs caused damage to CFG Peru and the Peruvian OpCos. Under Peruvian law, HSBC is liable for the full amount of damage caused by the JPLs.

### THIRD COUNT Breach of Duty Causing Loss Under Hong Kong Common Law

150. ~~126.~~The Trustee repeats and realleges the allegations in paragraphs 1 through ~~125~~149 above, as if fully set forth herein.

151. ~~127.~~Under Hong Kong law, a lender exercising its power of sale over security owes the borrower a duty of care to obtain the true market value of the asset. After deducting for the amount owed to the lender, the proceeds of sale belong to the borrower. The borrower therefore is vitally affected by the results from the sale of its assets by the lender.

152. ~~128.~~Under these circumstances, the lender owes the borrower a duty of care to achieve true market value in the sale and a duty of good faith to act honestly and without reckless disregard for the borrower's interests.

153. Under Hong Kong Law, a creditor filing an application for the appointment of liquidators assumes the duty to act in good faith (the corollary being the duty to not act in bad

faith) and the duty to take reasonable care to not cause damage to the borrower's assets, whether itself or through its agent(s). These duties are ongoing in nature, and apply even after the appointment of liquidators.

154.    ~~129.~~CFG Peru, as the owner of the Peruvian Opcos, is vitally affected by the result of any sale of the Peruvian Business. The proceeds of any sale, after deducting for the amount owed to the Club Lenders, will accrue to the account of CFG Peru, as owner of the Peruvian Opcos. As a creditor of ~~N.S. Hong,~~ CFGL, CFIL, and Smart Group, CFG Peru also is vitally affected by the result of any sale of the Peruvian Business. The proceeds of any such sale may accrue to their account.

155.    ~~130.In~~Upon filing the application for the appointment of the Hong Kong JPLs, and in getting the JPLs appointed and taking control of the sale process for the Peruvian Businesses through the HSBC Undertaking, HSBC assumed a duty of care and of good faith.

156.    ~~131.~~HSBC breached both of these duties by, among other things, acting in reckless disregard for the interests of CFIL, CFGL, and CFG Peru~~,~~; focusing myopically on the payment of its own debt to the detriment of other creditors~~,~~; creating an environment that chilled bidding, ~~and~~ imposing truncated deadlines in the Deed of Undertaking; ignoring the Club Lenders' concerns; and breaching its duty of full and frank disclosure by, among other things, relying on the one- year old FTI Report, failing to disclose Deloitte's opinion that the Peruvian operations were well-run, failing to apprise the Hong Kong Court of the status of the sale process, and proceeding with the ex parte application despite knowing that the appointment of JPLs would depress the value of the Peruvian Business.

157.    ~~132.~~HSBC's actions materially and negatively impacted the value of the

Peruvian Business and harmed CFG Peru's equity interest in the Peruvian OpCos and harmed

entities against whom CFG Peru has asserted claims.

158.    133.Under Hong Kong law, parties filing an ex parte petition for the appointment of

provisional liquidators have a duty to fully and frankly disclose all material facts to the deciding

court.

159.    HSBC failed to satisfy its obligation, when making an ex parte application to (i)

make proper enquiries before bringing the application; and (ii) bring to the court's attention all

facts material to the determination of the party's right to that injunction as well as any points that

could have been made by the defendant. Nor did HSBC provide any undertaking with respect to

damages in connection with the JPL Application, as is ordinarily provided on ex parte

applications. Such an undertaking may have caused HSBC to act with greater restraint.

160.    134.HSBC breached its duty of candor with the Hong Kong Court and failed to

inform the Hong Kong Court of material facts in its ex parte application that it either knew or

should

have known.

161.    135.HSBC had a duty to inform the Hong Kong Court of all facts relevant to the

FTI Report upon which its application rested, including, without limitation, the timing of its

preparation as well as its focus and purpose. HSBC materially misrepresented (either directly or

by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its

allegations, in violation of its obligations to that court.

162.    136.There was no need to appoint liquidators because there was no risk of

dissipation of assets, a fact that HSBC understood and that was corroborated by the lack of

support among the other Club Lenders for those proceedings and, their concern that the

appointment of liquidators not only damaged operations but also damaged the companies' value

and obstructed the sale process, and their suspicion that HSBC did nothing with the FTI Report for more than a year while HSBC secured repayment of its bilateral facilities. That suspicion was well founded,

considering that HSBC agreed with Pacific Andes Group management to keep from the other Club Lenders the fact that the Pacific Andes loans were being managed in HSBC's risk area. And, HSBC knew its evidence was flimsy. HSBC expected the JPLs would be discharged after the four-day evidentiary hearing.

163.    137.Largely on the basis of the Hong Kong Court's decision, the Cayman Court also appointed provisional liquidators.

164.    138.The Peruvian Opcos are the cornerstone of the Trustee's restructuring efforts in the United States.

165.    139.The extent to which there was no need to appoint the liquidators to preserve assets is underscored by the lack of support among the other Club Lenders for those proceedings and their concern that the appointment of liquidators not only damaged operations but also damaged the companies' value and obstructed the sale process.

166.    140.Largely on the basis of the Hong Kong Court's decision, the Cayman Court also appointed provisional liquidators.

141.The Peruvian OpCos are the cornerstone of the Trustee's restructuring efforts in the United States.

167.    142.The appointment of provisional liquidators significantly harmed CFG Peru, which owns the Peruvian OpCos, including, among other things, by causing the Peruvian OpCos to lose access to liquidity needed to operate their businesses and materially impeding fishing operations.

168.    143.The appointment of the JPLs also caused a substantial decrease in the value

of CFG Peru's equity interest in the Peruvian OpCos by causing the companies' operations to contract and interfering with a measured and deliberate sale process.

169.    ~~144.~~Before the appointment of the JPLs, indications of interest totaled as much as $1.7 billion. After the appointment, they were much lower—by at least $200 million. While one indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed to the next round of the sale process. The remaining non-binding expressions of interest that were received were in much lesser amounts. HSBC expected to receive a "price starting with a 9."[86]

170.    ~~145.~~From and after November 25, 2015, HSBC exerted control over the CF Group by having the JPLs appointed, sending them as its surrogates to Peru immediately after their appointment to meet with the Peruvian OpCos' lenders in a manner that disrupted those relationships, obtaining the HSBC Undertaking, and dictating the terms of the sale process for those entities.

171.    ~~146.~~HSBC knew the appointment of the JPLs would damage to the value of ~~the Peruvian Opcos and~~ CFG Peru's equity interest in the Peruvian OpCos. Yet in order to realize a sale – even at a depressed valuation – HSBC proceeded with the application, breaching its duties to the Hong Kong Court in the process. It acted with reckless disregard for the interests of CFIL, CFGL and CFG Peru, and breached its duties of care and of good faith.

**FOURTH COUNT Unlawful Interference With Business Under Hong Kong Law**

172.    The Trustee repeats and realleges the allegations in paragraphs 1 through 171 above, as if fully set forth herein.

173.    Under Hong Kong law, a defendant may be liable for unlawful interference with business where it uses unlawful means to interfere with the actions of a third party in relation to the plaintiff, intending to cause harm.

174.    HSBC used unlawful means to have the JPLs appointed as reflected by HSBC's failure to discharge its duty of full and frank disclosure on the ex parte application; HSBC's breach of its duties of care and good faith under Hong Kong law; HSBC's failure to give the type of undertaking for damages that is ordinarily provided on ex parte applications; and HSBC's breach of obligations under Peruvian and U.S. law.

175.    The appointment of the JPLs clearly interfered with the actions of third parties in relation to CFG Peru. Among other things, the appointment chilled bidding in the sale process, created a market perception that the Peruvian Business could be acquired for a lower price, and otherwise scuttled a deliberate and measured sale process, the details of which HSBC was aware.

176.    HSBC's interference was unlawful. Among other things, HSBC breached its duty of candor with the Hong Kong Court and failed to inform it of material facts that it knew or should have known would be relevant. HSBC misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court, resulting in the appointment of the Hong Kong JPLs here.

177.    HSBC intended to cause loss. Having obtained repayment on its bilateral facilities, HSBC no longer had an interest in a value-maximizing sale process. Instead, HSBC was content to have the JPLs consummate an expedited liquidation of the Peruvian Business even though that liquidation would yield significantly less than would be realized through a measured, deliberate sale process. The appointment of the JPLs at HSBC's request caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank. As a result of HSBC's interference with the prospective business relationships with BCP, BBVA, Scotia Bank and other lenders and inventory financiers as well as prospective purchasers of the Peruvian Business, CFG Peru suffered actual damage, including a diminution in the value of its equity interests in the

---

Peruvian OpCos.

## FIFTH COUNT Tortious Interference with Business Relationship (U.S. Law)

178. 147.The Trustee repeats and realleges the allegations in paragraphs 1 through 146177 above, as if fully set forth herein.

179. 148.Prior to the JPL Application, BCP provided inventory financing to the Peruvian OpCos of up to $100 million plus an additional $15 million in short-term working capital. The Peruvian OpCos also received local financing from BBVA and Scotia Bank. This financing was essential to fund operations of the Peruvian OpCos, including payments to suppliers and employees.

180. 149.HSBC knew that the Peruvian OpCos required financing to fund their operations and that the Peruvian OpCos had relationships with the local banks and warehouse inventory financiers that provided that financing.

181. 150.On November 25, 2015, HSBC filed the JPL Application seeking, among other things, the appointment of provisional liquidators over CFGL and CFIL and thereby intentionally interfered with those relationships. HSBC's conduct was intentional because HSBC knew that interference with the Peruvian OpCos' relationship with their lenders was certain or substantially certain to occur as a result of its actions.

182. 151.The appointment of the JPLs caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank. BCP suspended its $100 million facility with the Peruvian OpCos because of the appointment of the JPLs. BBVA and Scotia Bank similarly suspended their facilities with the Peruvian OpCos.

183. 152.The interference was improper because HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte

application that it knew or should have known. HSBC had a duty to inform the Hong Kong

Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose. HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.

184.   ~~153.~~CFG Peru suffered actual losses as a result of HSBC's interference with the relationships with BCP, BBVA, Scotia Bank and other lenders or inventory financiers.

**~~FIFTH~~SIXTH COUNT Tortious Interference with Prospective
Economic Advantage (U.S. Law)**

185.   ~~154.~~The Trustee repeats and realleges the allegations in paragraphs 1 through ~~153~~184 above, as if fully set forth herein.

186.   ~~155.~~Prior to the JPL Application, BCP provided inventory financing to the Peruvian OpCos of up to $100 million plus an additional $15 million in short-term working capital. The Peruvian OpCos also received local financing from BBVA and Scotia Bank. This financing was essential to fund operations of the Peruvian OpCos, including payments to suppliers and employees.

187.   ~~156.~~The appointment of the JPLs caused significant instability with the local Peruvian lenders—including BCP, BBVA, and Scotia Bank. BCP suspended its $100 million facility with the Peruvian OpCos because of the appointment of the JPLs. BBVA and Scotia Bank similarly suspended their facilities with the Peruvian OpCos.

188.   ~~157.~~CFG Peru suffered actual losses as a result of HSBC's interference with the prospective business relationships with BCP, BBVA, Scotia Bank and other lenders or inventory financiers.

189.   ~~158.~~Prior to the JPL Application, Pacific Andes Group management was contemplating a measured and deliberate process for the sale of the Peruvian Business.

190.   ~~159.~~In November 2015, two investors interested in acquiring the CF Group for as

much as $1.7 billion were in discussions with the Pacific Andes Group. A memorandum of understanding was expected to be signed on November 26, 2015. On November 25, 2015, HSBC filed the JPL Application seeking, among other things, the appointment of provisional liquidators over CFGL and CFIL, and intentionally interfered with those prospective relationships. At the time it commenced the liquidation proceedings, HSBC was aware of the details of the sale process, including the categories and number of potential bidders, the range of the potential bids, and the upcoming deadlines. HSBC knew that interference with the prospective relationships with those potential purchases was certain or substantially certain to occur as a result of its actions.

191.   160. HSBC used unfair and improper means to interfere with these prospective relationships. HSBC breached its duty of candor with the Hong Kong Court and failed to inform the Hong Kong Court of material facts in its ex parte application that it knew or should have known. HSBC had a duty to inform the Hong Kong Court of all facts relevant to the FTI Report upon which its application rested, including, without limitation, the timing of its preparation as well as its focus and purpose. HSBC materially misrepresented (either directly or by omission) to the Hong Kong Court its full knowledge of the evidentiary record underlying its allegations, in violation of its obligations to that court.

192.   161. The JPL Application not only interfered with the prospective relationships with the two investors, but it also changed the environment in which the sale was being conducted and invited lower bids. For example, a potential purchaser indicated it would be willing to offer around $1.6 billion for the Peruvian OpCos but would not be willing to offer a similar sum if the sale process was run by the JPLs. Further, the compressed timeframe imposed by HSBC in the HSBC Undertaking chilled bidding.

193.   162. CFG Peru suffered actual losses as a result of HSBC's interference with

the prospective business relationships with potential purchasers of some or all of the Peruvian Business.

### ~~SIXTH~~SEVENTH COUNT Equitable Subordination or Disallowance of Claims Under 11 U.S.C. §§ 105(a), 502(a), and 510(c)

194.    ~~163.~~The Trustee repeats and realleges the allegations in paragraphs 1 through ~~159~~194 above, as if fully set forth herein.

195.    The Court appointed the Trustee with respect to CFG Peru, noting, among other things, that "[i]t makes little practical or economic sense to appoint a trustee for each Debtor;" that "it is uncertain what impact such an appointment would have on (i) the Debtors' other businesses and affiliates (including non-debtor operating subsidiaries) and their creditors and constituents, and (ii) the corporate governance of the affected Debtor and non-Debtor entities in foreign jurisdictions (including publicly traded companies);" and that the Trustee's appointment at CFG Peru "presents limited corporate governance and recognition issues."

196.    ~~164.~~CFG Peru is a creditor and party in interest in the chapter 11 cases of CFGL, ~~N.S. Hong,~~ CFIL, and Smart Group and therefore entitled pursuant to section 502(a) to object to filed proofs of claim.

197.    ~~165.~~HSBC has filed proofs of claim in the chapter 11 cases of CFGL (No. 98-1, 105- 1), N.S. Hong (62-1, 86-1), CFIL (No. 40-1), and Smart Group (No. 76-1, 77-1) in an amount "no less than $104,826,809.47" (collectively, the "HSBC Proofs Of Claim").

198.    CFG Peru has filed proofs of claim against other debtor entities that are located above CFGL in the capital structure. Those claims will benefit to the extent the claims of HSBC are equitably subordinated or disallowed at CFIL, CFGL, or Smart Group.

199.    ~~166.~~HSBC was an insider of the Debtors, either as a "person in control of the debtor" pursuant to 11 U.S.C. § 101(31)(B), or as a non-statutory insider.

200.    ~~167.~~HSBC engaged in and benefited from inequitable conduct that resulted in

injury to the creditors and parties in interest in the chapter 11 cases of CFGL, N.S. Hong, CFIL, and Smart Group, including CFG Peru, and conferred an unfair advantage to HSBC. This inequitable conduct resulted in harm to CFG Peru and the creditor body in those Chapter 11 Cases because creditors are less likely to recover the full amounts due to them.

201.    168. HSBC's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed CFG Peru and the creditors and stakeholders in the Debtors' chapter 11 cases.

202.    CFG Peru suffered injury that was particular to CFG Peru and not suffered by other creditors because, inter alia, CFG Peru is the 100% equity holder of the Peruvian OpCos; the Peruvian OpCos sustained direct damages to their operations as a result of HSBC's conduct; and the value of the Peruvian OpCos as assets being sold through a measured and deliberate sale process was directly impacted by HSBC's conduct.

203.    HSBC benefited from its conduct by using the Hong Kong JPLs to wrestle control of CFG Peru and the Peruvian Business, which is the crown jewel of the Pacific Andes companies. Once appointed, the Hong Kong JPLs insisted on meeting with the creditors and prospective buyers of the Peruvian OpCos. And, within six weeks of their appointment, the Hong Kong JPLs had already been in contact with twenty-one potential buyers for the Peruvian Business in an effort to sell them as quickly as possible for the benefit of HSBC.

204.    The Hong Kong JPLs caused significant harm to CFG Peru's equity interest in the Peruvian OpCos and to those companies themselves by, among other things, causing the

Peruvian OpCos to lose access to liquidity needed to operate their businesses from banks that provide working capital and warehouse companies and other forms of inventory financing and impaired fishing operations.

205.    The Peruvian OpCos are the cornerstone of the Trustee's restructuring efforts in the United States, and his mandate is to maximize their value. As a result of the appointment of the JPLs and HSBC's collection efforts thereafter, including the HSBC Undertaking, the Peruvian OpCos and CFG Peru suffered damages resulting from lost revenue and profit, increased financing costs, and lost capacity. The appointment of the JPLs also caused a substantial decrease in the value of CFG Peru's equity interest in the Peruvian OpCos because it caused the companies' operations to contract and interfered with a process for a measured and deliberate sale of those companies.

206.    Before the appointment of the JPLs, indications of interest totaled as much as $1.7 billion. After the appointment, they were much lower—by at least $200 million. While one indication of interest totaled $1.5 billion, that party refused to take the necessary steps to proceed to the next round of the sale process. The remaining non-binding expressions of interest that were received were in much lesser amounts. HSBC expected to receive a "price starting with a 9."[87]

207.    169.In equity and good conscience, any claim or interest of HSBC asserted against the Debtors' estates, including those asserted in the HSBC Proofs Of Claim, should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and/or disallowed to the fullest extent permitted by law.

---

[87]    HSBCHK-TR-00018131.

208.    170. Equitable subordination or disallowance, as requested herein, is consistent

with the provisions and purposes of the Bankruptcy Code.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of the Trustee

and against the Defendant as follows:

A.      on the First Count, under Peruvian Civil Code Articles ~~1969, 1981,~~1969 and 1985, entering judgment for the Trustee and against HSBC for damages caused by HSBC's malice and/or negligence;

B.      on the Second Count, under Peruvian Civil Code Articles ~~1978, 1981,~~1981 and 1985, entering judgment for the Trustee and against HSBC for damages caused by the Hong Kong JPLs ~~with~~at the ~~assistance~~direction of HSBC;

C.      on the Third Count, under Hong Kong common law, entering judgment for the Trustee and against HSBC for damages caused by HSBC's breach of duties;

D.      on the Fourth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's ~~tortious~~unlawful interference with business ~~relationships~~under Hong Kong law;

E.      on the Fifth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's tortious interference with business relationships under U.S. law;

F.      on the Sixth Count, entering judgment for the Trustee and against HSBC for damages caused by HSBC's tortious interference with prospective economic advantage under U.S. law;

G.      ~~F.on the Sixth Count,~~ on the Seventh Count, under sections 105(a), 502(a), and 510(c) of the Bankruptcy Code, subordinating and/or disallowing the HSBC Proofs Of Claim for purposes of distribution to all allowed claims and equity interests of Debtors CFGL, N.S. Hong, CFIL, and Smart Group, such that no claim of HSBC is paid ahead of the allowed claim of any customer, creditor, or shareholder of Debtors CFGL, N.S. Hong, CFIL, or Smart Group, including CFG Peru;

H.      ~~G.~~awarding damages with respect to the First through ~~Fifth~~Seventh Counts, including (a) damages resulting from lost revenue and profit, increased financing costs, lost capacity, and the inability of the Peruvian OpCos to realize the quota allocated to them by the Peruvian government—in an amount to be proven at trial, but not less than $45 million and (b) damages to the value of the Peruvian Business and CFG Peru's equity interests caused by HSBC's interference with its operations and interference with the sale (as reflected by, among other things, the difference between bids received before and after the appointment of the JPLs)—in an amount to be proven at trial, but not less than $200 million;

I.    ~~II.~~ the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding; and

J.    ~~I.~~ granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

DATED:    New York, New York
          ~~June 29, 2018~~ March 7, 2019

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: /s/ JAMES C. TECCE

James C. Tecce Julia M.
Beskin Kate Scherling
Jordan Harap

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

*Counsel for William A. Brandt, Jr., Chapter 11
Trustee for CFG Peru Investments Pte. Ltd.
(Singapore)*

Document comparison by Workshare 9 on Thursday, April 18, 2019 3:06:47 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\williampugh\Desktop\Corrected Amended Complaint\Filing Folder\(1)To Be Sent - Redacted Adversary Complaint.pdf |
| Description | (1)To Be Sent - Redacted Adversary Complaint |
| Document 2 ID | file://C:\Users\williampugh\Desktop\Corrected Amended Complaint\Filing Folder\(2)To Be Redacted - Corrected First Amended Complaint_Redacted.pdf |
| Description | (2)To Be Redacted - Corrected First Amended Complaint_Redacted |
| Rendering set | Standard no moves |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 574 |
| Deletions | 334 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |

| Total changes | 908 |
|---|---|